683 So.2d 1176 (1996)
PUFF `N STUFF OF WINTER PARK, INC., et al., Appellants,
v.
James T. BELL, Daniel W. Lykens, et al., Appellees.
No. 95-122.
District Court of Appeal of Florida, Fifth District.
December 20, 1996.
*1177 Douglas C. Spears of Pleus, Adams & Spears, Orlando, for Appellants.
Eli H. Subin of Subin, Rosenbluth, Losey, Brennan, Bittman & Morse, P.A., Orlando, for Appellees.

EN BANC
COBB, Judge.
This is an appeal from a final summary judgment against the appellantsPuff `N Stuff of Winter Park, Inc. and Glenn and Christine Dietelin regard to their counterclaim and third-party actions below against the appellees. The case arises from a foreclosure action instituted by one of the appellees, Federal Trust Bank (FTB), against the appellants because of various defaults on loans. The loans to Puff `N Stuff and the Dietels were made for the acquisition and renovation of a building in Winter Park.
While construction was in progress, a dispute arose between the parties as to whether or not FTB had verbally agreed to fully fund the project. The allegations in the retaliatory counter-actions by Puff `N Stuff and the Dietels were that they had been verbally assured by Bell, an officer of FTB, that the bank's lending limit would not be a problem, and that ultimately it was, thereby causing a delay in construction and the necessity for Puff `N Stuff and the Dietels to incur additional financing from a private source in order to complete the construction. They also claimed that FTB failed to honor its verbal commitments to provide additional financing after a "replacement loan" was obtained. All of the damages claimed by Puff `N Stuff and the Dietels in their affirmative claims were based on the alleged failure of FTB to fully and timely provide funding pursuant to verbal agreements to do so.
We hold that the trial judge was correct in applying section 687.0304(2), Florida Statutes (1989) in accordance with its plain meaning i.e., the debtors in this case cannot maintain their actions which are based, according to the allegations and proof, on an oral promise to extend credit. That section provides:
CREDIT AGREEMENTS TO BE IN WRITING.A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor.
The appellants' contention that an oral promise to loan money[1] can be termed "fraud in the inducement," thereby evading the clear intent of the statutory prohibition, was recognized by the trial judge as mere semantics. If this court were to adopt the appellants' analysis in this case, we would effectively repeal the statute. See generally Canell v. Arcola Housing Corp., 65 So.2d 849 (Fla.1953)(statute of frauds may not be avoided by suit for fraud based upon oral representations).
AFFIRMED.
PETERSON, C.J., and DAUKSCH, HARRIS and ANTOON, JJ., concur.
HARRIS, J., concurs specially with opinion.
GRIFFIN, J., dissents with opinion, with which W. SHARP, GOSHORN and THOMPSON, JJ., concur.
*1178 HARRIS, Judge, concurring specially:
I concur with Judge Cobb's opinion, which is based on section 687.0304(2), Florida Statutesa banking "statute of frauds." I write because the issue relating to the economic loss rule deserves further discussion.
Appellants allege that the bank agreed to loan them $1,025,000 and that although the bank acknowledged that it presently lacked the lending authority to make that loan, it nevertheless assured them that the limit would be increased or another avenue would be found so that the entire loan would be fully and timely funded. Therefore, appellants' core allegation is that the bank committed to loan them $1,025,000 in a timely manner. Based on these allegations, the parties had a contract which required the bank to advance all of these funds in a timely manner even if the lending limit problem persisted.
Appellants then assert that because the lending limit problem was not immediately resolved, the written loan commitment was for only $520,000. Appellants accepted this commitment and closed on the loan and used the funds to purchase the real estate on which they intended to construct a building. When they started construction of the building, they did so without a formal loan commitment, apparently choosing to rely on the alleged oral understanding. Hence, when the first construction draw came due, they borrowed an additional $60,000 from the bank under a future advance clause in their original loan documents. Subsequently, the bank loaned appellants an additional $15,000 secured by vehicles and $32,000 secured by kitchen equipment.
At this point, a dispute arose as to additional funding. Appellants claim that in spite of the fact that the bank assured them that the lending limit would pose no problem, the bank refused additional timely loans because of that limit. The bank asserts that it made no such commitment in the first place; that the piecemeal loans merely reflect an effort to accommodate a borrower. Although an amount in excess of the alleged promised loan was eventually provided by the bank, albeit in a circuitous manner, appellants claim that they were injured because the bank did not advance all of the funds agreed to in a timely manner.
One would think that appellants would therefore sue the bank on the "master loan agreement"that is, the original oral agreement to loan $1,025,000 in a timely manner. But the rub, of course, is section 687.0304(2), which requires that before a loan commitment can be enforced, it must be in writing. This protects both the banks against fraudulent borrowers and the borrowers against deceitful banks.
But appellants had unfortunately failed to get this more generous commitment in writing. Not to worry. To avoid this technical impediment, appellants decided that instead of attempting to sue on the oral agreement, they would allege that a portion of that agreement, the fact that the bank would obtain increased lending authority or find another way to fund the loan in a timely manner, fraudulently induced them to enter into this lending arrangement in the first place. And, because the bank never intended to fully fund its commitment (even though it eventually did), appellants urge that the bank is liable because of its intentional tort of fraudulent inducement.
Some courts are beginning to look more closely at fraud in the inducement allegations. In Dewachter v. Scott, 657 So.2d 962 (Fla. 4th DCA 1995), the court was concerned with a fraud in the inducement action brought when the contract itself was unenforceable. The court stated:
We believe that the trial court correctly granted summary final judgment for the defendant, based on these allegations because an oral contract for lifetime employment is terminable at will. [Citations omitted]. Even though Dewachter couched her complaint as fraud in the inducement rather than breach of contract, we believe her claim is still barred as it attempts to circumvent the bar to a breach of contract action based on an oral contract terminable at will. Since the parties clearly cannot be restored to the status quo that existed before the alleged contract, as might be sought in an action based on fraud in the inducement, the measure of *1179 damages Dewachter sought here would be the same as breach of contract damages. See Canell v. Arcola Housing Corp., 65 So.2d 849 (Fla.1953) (court stated that where a contract is within the statute of frauds and unenforceable, action for damages cannot be maintained on ground of fraud in refusing to perform the contract, recognizing that the plaintiff's action for fraud and deceit was simply an attempt to obtain damages for breach of contract). Thus, we hold the trial court correctly granted summary final judgment in Dr. Scott's favor.
As I indicated in my dissent in Williams v. Peak Resorts International, Inc., 676 So.2d 513 (Fla. 5th DCA 1996), almost any contract claim can be framed as a fraud in the inducement action. This case proves the point. Therefore it seems more appropriate, if the economic loss rule has any real substance, to look not at the label placed on the claim by the attorney but rather at the substance of the claim. For example, assume A, Inc. and B enter into a joint venture agreement in which B puts up the property in exchange for A, Inc. agreeing to develop and market the property and then pay B out of the proceeds of sales an agreed price for the property plus a percentage of the profits. However, because B is concerned about the financial strength of A, Inc. and in order to induce B to enter the joint venture agreement, A, Inc. falsely represents that its investors have put up $100,000 to pay off general creditors. Even though A, Inc. proceeds to develop the property in accordance with its agreement, its unpaid general creditors are able to put A, Inc. into bankruptcy thus subjecting B's property to the claims of A, Inc.'s previous creditors. In this case, the false representation is separate and distinct from the development agreement and B suffered injury by relying on it.
But consider our case. It is alleged that the bank represented that although it presently lacked the necessary lending authority to make the million dollar plus loan, it would either obtain the necessary lending authority, or find another way to make the agreed loan, in a timely fashion. But this representation goes to the heart of the agreement between the parties and is inseparable from the agreement to make the loan. To permit this type representation to constitute a fraud in the inducement claim is the same as saying that anytime one breaches a contract, the other side merely needs to allege that the breaching party never intended to honor its commitment and thus is liable for fraud in the inducement. The one suing must then prove the breach of the agreement in order to prove the misrepresentation.
In Richard Swaebe, Inc. v. Sears World Trade, Inc., 639 So.2d 1120,1121 (Fla. 3d DCA 1994), a contract action which included a count for fraud, the court upheld the setting aside of an award for fraud (including punitive damages) stating:
Finally, RSI contends that the trial court incorrectly determined that the economic loss rule serves as a bar to RSI's recovery of both fraud and punitive damages awards. We disagree. The relationship between RSI and SWT was strictly contractual and RSI has not proved that a tort independent of the contractual breaches was committed. The fraud for which the jury found SWT liable was not a separate and underlying tort, but rather merely a breach of the RSI/SWT contracts.
Even if the bank in our case assured appellants that it had or would have the appropriate lending limit or find an alternative way to fund the loan so that the entire commitment could be timely funded, this is not an independent representation; it is the essence of the agreement between the parties. It is all intertwined and is inseparable.
The tortuous progress of an en banc review being what it is, most of the above opinion was written before the supreme court released HTP, Ltd., v. Lineas Aereas Costarricenses, S.A., 21 Fla. L. Weekly S447, ___ So.2d ___ (Fla. Oct. 18, 1996). The question now is whether Lineas has rejected the above analysis. The answer to this question, of course, depends on what the supreme court means when it talks of "torts independent of the contractual breach", and "a tort action ... independent from acts that breached the contract." For example, suppose a contract includes a warranty, expressed or implied, which is breached. May *1180 the injured party waive the warranty claim and sue for fraud in the inducement? May he sue for both? What exactly does "independent of the contract" mean?
Fraud in the inducement is an independent tort but the fraudulent misrepresentation underlying the action may or may not be independent of the contract. If we are to say, as some urge, that because fraud in the inducement is an "independent tort" (as opposed to independent of the contract) it is never barred by the economic loss rule, then the matter is resolved by a "bright line" test. But that ignores the distinction set forth in Huron Tool & Engineering Co. v. Precision Consulting Services, Inc., 209 Mich.App. 365, 532 N.W.2d 541 (1995), approved by the supreme court in Lineas:
The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction drawn by a New Jersey federal district court between fraud extraneous to the contract and fraud interwoven with the breach of contract. With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort.
This would seem to mean that if the inducing misrepresentation forms a part of the contract, such as a warranty, then such misrepresentation cannot, at law, form the basis of a fraud in the inducement action. From the facts given in Lineas and in Woodson v. Martin, 663 So.2d 1327 (Fla. 2d DCA 1995), we simply cannot tell whether the alleged fraud was "interwoven" with the breach of contract. Both cases seem to have been decided on a "bright line" basisLineas: if the cause of action is pled as fraud in the inducement, the economic loss rule cannot apply; Woodson: if there is a contractual relationship between the parties, fraud in the inducement will never lie. Would it not be more in keeping at least with the spirit of the original economic loss cases to consider the relationship between the inducing representation and the essential requirements, expressed or implied, of the contract agreed to by the parties? We know from Woodson that the home was represented to be "almost new." Apparently it was not. But we do not know whether the contract required the seller to deliver an "almost new" home. If it did and if the seller breached this portion of the contract, would a fraud in the inducement action lie instead of or in addition to the contract action merely because the representation was made before the formal contract was signed? Because one is always "induced" to enter into a contract because of the contract terms, if the economic loss rule survives at all, should we not look to the substance of the claim before determining whether a fraud in the inducement action is truly viable? And if it is the commercial fraud itself which we wish to punish by permitting this alternative or dual cause of action in a contract setting, why do we limit it to fraud in the inducement rather than commercial fraud generally?
I have taken the position in this concurring opinion that if the representation being relied on as the fraudulent inducement is an integral part of the contract, either expressed or implied, and if it is the breach of the contract that causes damage, then the economic loss rule should apply and one should be limited to a contract action.
Would the result have been different in Florida Power & Light Co. v. Westinghouse Electric Corp., 510 So.2d 899 (Fla.1987), the fount of Florida's economic loss rule, if Florida Power's lawyer had had the foresight to not only sue for breach of warranty but also allege that his client had been fraudulently induced to enter into the contract because of Westinghouse's false representation that it was capable of designing and manufacturing nuclear steam supply systems that wouldn't leak? Even if this representation was not expressly made, is it not implied from the nature of the contract? And is not such representation an integral part of the contractual relationship and inseparable from it thus precluding it from being the basis of a fraud in the inducement action?
Obviously if HTP requires a bright line approach if one can merely "plead" a fraud in the inducement cause of action even based on provisions, expressed or implied, in the contract, then this analysis fails. Hopefully the *1181 supreme court will give us further guidance in this matter.
GRIFFIN, Judge, dissenting.
I respectfully dissent from the majority opinion because section 687.0304(2), Florida Statutes, is not a bar to appellant's fraud in the inducement claim.
Glenn and Christine Dietel [the "Dietels"] are the owners of Puff `N Stuff, a catering company located in Winter Park, Florida. The suit below arose out of a series of loans made by FTB to the Dietels and Puff `N Stuff for the acquisition and renovation of a building on Forsyth Road in Winter Park which the Dietels planned to use as a banquet and catering facility. Bell was the founder and president at FTB. Lykens was a vice-president.
The Dietels met Bell in June 1990, when they approached him about catering the opening of the bank. The Dietels allege that Bell "aggressively" induced them to pursue financing of the Forsyth Road project with FTB even though they had received a preliminary loan commitment from another lender. Bell fully familiarized himself with the Dietels' finances, was aware that the Dietels needed to borrow at least $1,025,000 for the project and knew that, because of their commitments and their cash flow, timely funding of the project was essential. Bell allegedly represented to the Dietels that, due to the equity in the remodeled property, the bank could fund the entire loan, even though its lending limit at that time was $600,000. In response to the Dietel's expressed concern about the lending limit, he specifically assured the Dietels that:
[TFB's] $600,000 lending limit would present no problem in any event because of a stock offering by the bank that would raise the lending limit to a single borrower well before additional funds were needed for the construction work. In addition, BELL assured the DIETELS that even if the lending limit did not increase in time he would always be able to work something out to guarantee the BANK could issue the balance of the necessary loan.
Lykens participated with the Dietels in the planning of the project, including review of cost estimates and participation in selection of the contractor. Despite knowing that the Dietels believed FTB able to fund the project, at no time did Lykens or Bell inform the Dietels that FTB lacked the capacity to fund the loan.
The Dietels received their first written loan commitment from FTB in the amount of $520,000 on October 19, 1990, three days before the closing of the Forsyth Road property. All of these monies were utilized to fund the purchase of the property or to pay associated costs. The Dietels executed a mortgage in favor of FTB as security for the loan. The Dietels then entered into a contract in the amount of $730,000 for renovation of the existing facility.
When construction began in July 1991, the first construction draw was funded by FTB by way of a "future advance" promissory note in the amount of $60,000. Next, on August 1, 1991, the Dietels borrowed an additional $15,133.39 from FTB, secured by three vehicles. On August 7, 1991, the Dietels borrowed yet another $32,000 from FTB, which was secured by various kitchen equipment used in the business and which was personally guaranteed by Ms. Dietel.
When the second draw request was submitted, however, the Dietels allege that Lykens and FTB then informed them that FTB had reached its $620,000 lending limit to one borrower and could not provide further funding. After FTB refused to fund the second construction draw because it would exceed the bank's lending limit, the Dietels' contractor halted construction on the project, allegedly resulting in severe damage to the work which had already been completed. The project remained in suspension for more than ninety days. The Dietels claim that Lykens began working with a mortgage broker, Donald B. Robertson, in an attempt to help the Dietels find replacement financing for the project. The affidavit of Robertson, filed in opposition to the motion for summary judgment, stated that:
4. In acting in the capacity of mortgage broker, I had direct contact with Daniel Lykens of Federal Trust Bank regarding *1182 the loan transaction that had been entered into by Federal Trust Bank.
5. My discussions with Mr. Lykens began in late June or early July of 1991. Mr. Lykens specifically expressed an urgent desire on behalf of Federal Trust Bank to do whatever needed to be done to obtain replacement financing for the project. He specifically acknowledged to me that he, James Bell and Federal Trust Bank had represented to Puff `N Stuff of Winter Park, Inc. and the Dietels that Federal Trust Bank would provide all construction financing for this project and that they would have the necessary lending limit under Federal law in order to make the loans required.
6. Furthermore, Mr. Lykens, in my presence, acknowledged to an officer of another potential bank participant that they had represented to Puff `N Stuff of Winter Park, Inc. that they would in fact provide the construction financing for this project and would have the available lending ability to do so.
* * * * * *
9. Puff `N Stuff of Winter Park, Inc. incurred substantial additional costs and charges, including the obligation to pay a mortgage brokers [sic] commission to me which would not have otherwise been necessary but for the need for Federal Trust Bank to replace a portion of its outstanding loans in order to meet its obligations to Puff `N Stuff of Winter Park, Inc., Glenn Dietel and Christine Dietel and comply with the federal lending restrictions applicable to Federal Trust Bank.
FTB denies that they had committed to funding the full project; they claim they were never involved in the plans for construction nor were they aware of the Dietels' need for a construction loan when the October 1990 loan was made. They say they nonetheless attempted to assist the Dietels.
It is undisputed that on October 3, 1991, FTB eventually "refinanced" the property by making a second loan to Ms. Dietel's parents in the amount of $620,000, the amount of the bank's lending limit, which loan was apparently used to pay off the earlier loans made by the Dietels, including the $60,000 construction draw. FTB simultaneously made a new loan to the Dietels and Puff `N Stuff in the amount of $620,000. Both of these loans were secured by mortgages on the Dietels' Forsyth Road property. According to the Dietels, the loan to Ms. Dietel's parents was a "sham" loan, which was a "blatant violation" of federal banking law. Furthermore, at the closing of the loan, despite representations to the contrary, FTB demanded security from Ms. Dietel's parents in the amount of $300,000, plus a mortgage on their home. All of these loans made by FTB allegedly were accompanied by closing costs, finance charges and various other charges.
Moreover, the new loan from FTB was itself insufficient to complete the construction because the delay had resulted in cost overruns and other project damage, so that the Dietels were forced to borrow additional monies from a private source in order to complete the construction. All of these events caused by the conduct of FTB, Bell and Lykens allegedly resulted in damages to appellants. These damages consist principally of additional expenses in connection with the series of stop-gap lending measures and increased costs of the project resulting from inability of FTB to lend $1,025,000 as represented.
The Dietels eventually found a new lender for the project. They were able to satisfy their own October 3, 1991 loan and, pursuant to a "Modification of Note and Mortgage" executed on April 9, 1992, Puff `N Stuff effectively assumed the loan which had been made to Ms. Dietel's parents. Each of the Dietels executed a guarantee and indemnity agreement in the amount of $620,000 in connection with the assumption.
The Dietels later defaulted on the FTB loans and on April 27, 1994, FTB filed a four count complaint against Puff `N Stuff and the Dietels to recover both the $100,000 loan made to the Dietels on October 17, 1991 and the $620,000 loan assumed by Puff `N Stuff on April 9, 1992 and guaranteed by the Dietels.
The Dietels asserted a number of affirmative defenses to FTB's claims. Pertinent to this appeal, they also filed a counterclaim and *1183 third-party complaint against FTB, Bell, Lykens and Federal Trust Corporation, which owns FTB. The essential premise on which all counts relied was that when Bell and FTB had induced the Dietels to withdraw from their other banking relationship and to place their business with FTB, FTB falsely represented that it had the capacity to timely fund their borrowing requirements of $1,025,000 even though they knew they could not make such a loan under governing banking law.
FTB then filed its motion for summary judgment. The Dietels and Puff `N Stuff filed a number of affidavits in opposition to the motion. In their affidavits, the Dietels verified the allegations contained in the counterclaim and third-party complaint. They further asserted that they had only limited knowledge of financial transactions when the loans were made and that they had relied on the "information and advice" of FTB, Bell and Lykens to complete the funding necessary for the project. The Dietels also stated that but for the representations made by FTB, Bell and Lykens, the Dietels would have proceeded with financing through Orange Bank as originally contemplated, but that once the original loan had been made by FTB, they had "no option" but to proceed with financing through FTB. The affidavits acknowledged that the money was ultimately lent them, but complained that:
[T]he loans were made in an untimely fashion. Due to delays solely attributable to Federal Trust Bank, James Bell and Daniel Lykens substantial losses of money as stated in the counterclaim and third-party complaint have been suffered. Further, the loans were made in a series of transactions made necessary by Federal Trust Bank's insistence, and that of James Bell and Daniel Lykens, that the loans be made in the name of different borrowers solely to circumvent what they claimed was applicable Federal law resulting in substantially greater expense to Puff `N Stuff of Winter Park, Inc. and [the Dietels] in terms of closing expenses and charges for the loans, fees associated with the completion of the loan documents and delays suffered as a consequence of the manner in which the loans were advanced.
Principal among the grounds raised in the motion for summary judgment was that their claims were based on a series of oral promises and representations and that the claims were therefore barred under the "banking statute of frauds." Section 687.0304(2), Florida Statutes (1989), provides:
A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and debtor.
The motion further asserted that all of the claims were tort claims based on fraud and misrepresentation which were barred by the "economic loss" rule because of the contractual relationship between the parties.[1]
The issue is whether the lower court could correctly grant summary judgment on the counterclaim and third-party claims filed by the Dietels and Puff `N Stuff on the ground that any such claim is barred by the provisions of section 687.0304(2), the "banking statute of frauds." The impetus for enacting section 687.0304(2) was explained in Brenowitz v. Central National Bank, 597 So.2d 340 (Fla. 2d DCA 1992):
This statute has been labelled by a commentator as a "new" statute of frauds which was enacted to protect lenders from liability for actions or statements a lender might make in the context of counseling or negotiating with the borrower which the borrower construes as an agreement, the subsequent violation of which is actionable against the lender.
Id. at 342, citing John H. Hickey, Credit Agreements Required in Writing: The New Statute of Frauds, LXIV no. 6 Fla. B.J. 69 (June 1990).[2]
*1184 By its express terms, section 687.0304(2) does not preclude an action for acts of fraud on the part of a bank that induce a party to rely to their detriment on knowingly false statements of fact. The cases relied on by the lower court, Griffiths v. Barnett Bank, 603 So.2d 690, 692 (Fla. 2d DCA 1992), and Brenowitz, are cases where the alleged misrepresentations fell within the statute's proscription, in that they were actions "on a[n oral] credit agreement," as defined. The statute defines a "credit agreement" as "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation." § 687.0304(1), Fla. Stat. (1989). Thus, purely and simply, the statute requires that any claim based on an alleged promise "to lend or forbear repayment of money" is barred if not memorialized in writing as required by the statute. The purpose of the legislation was to protect banks from claims by borrowers that there had been a promise to lend, or to adjust the terms of payment or to forebear payment even though no such agreement on the part of the bank was memorialized by any writing. Nothing in the language of the statute suggests it was designed to insulate a lender from a fraudulent representation that induces a borrower to place their business with the lender, accept certain terms or otherwise detrimentally rely on a lender's knowingly false statement of fact. A representation of fact is not an "agreement" and a representation of a lender's legal capacity to fund a loan of a certain size is not a "credit agreement." Moreover, a representation (or even a promise) other than to lend money or forebear repayment is not covered by the statute.[3] A misrepresentation of fact made to induce a borrower to make a loan is not embraced by the statute.
The legislative history for this statute confirms its intended scope. The legislative history to House Bill 878, which became section 687.0304(1), expressly provides that "statutes such as the one proposed impact only one area of lender liability and will not eliminate lender liability suits." The legislative history to a companion bill, Senate Bill 830, further provides that "the legislation only impacts one area of lender liability. Other related causes of action would still be available (i.e. fraud)."[4]
Here, although certain of appellants' claims are based on oral representations made by the bank in connection with an agreement to lend money, appellant plainly has pleaded a fraud claim based on the contention that FTB and/or FTC, through their officers, in order to induce the Dietels and Puff `N Stuff to desist negotiations with other banks and to do business with FTB, represented that FTB had the ability to finance the loan and that it had the ability to solve any extant regulatory limitations on its lending before the funds were required by the customer. This is not a claim based on an agreement to lend and is not barred by the statute. In holding otherwise, the majority has ignored the vital distinction between fraud and breach of contract and has misapplied the statute.
I agree with Judge Harris that fraud is a much overused and mis-used cause of action. Its abuse has been fueled by the access it *1185 provides to otherwise unavailable discovery and to punitive damages. Its misuse has been exacerbated by Florida's embrace of the "promissory" form of fraud whereby a promise made with no intent to perform is deemed actionable as fraud. Unfortunately, too many cases have gotten to the jury and large tort verdicts have been rendered on a theory of fraud that had no business being anything other than breach of contract. The problem is not with the distinction between fraud and breach of contract, however, the problem lies in our courts' failure to appreciate or require competent proof of the distinct elements. The statement that virtually any breach of contract action can be pleaded as fraud in the inducement proves the point. Every breach of contract cannot be pleaded as fraud in the inducementat least, not properly. Certainly, the classic type of fraud present in this casea knowingly false representation of factrequires a specific allegation of such a false representation. Even "promissory fraud," however, requires a specific allegation (and ultimate proof) that the promise was made with no intent to perform.
Fraud and breach of contract are two entirely different creatures. Judge Harris expressed the distinction well in our recent case of Acadia Partners, L.P. v. Tompkins, 673 So.2d 487 (Fla. 5th DCA 1996). In that case, the lender sought to sue the borrower for both breach of contract (the loan) and for fraud in inducing the lender to do business with the borrower by misrepresenting the borrower's financial condition and promising that the corporate borrower would not make loans to shareholders. The issue was whether the jury verdict in favor of the borrower on the breach of contract claim barred the fraud claim. In that context, even though the lender's fraud claims appear classically to fit the "its-really-just-breach-of-contact" argument articulated by the majority here, this court held that a defense verdict on the breach of contract did not preclude a fraud claim. We relied on Ashland Oil, Inc. v. Pickard, 269 So.2d 714 (Fla. 3d DCA 1972), cert. denied, 285 So.2d 18 (Fla.1973), that:
[O]ne who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refuses to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract. The same basic transaction gives rise to distinct and independent causes of action which may be consecutively pursued to satisfaction. `Thus, an action on a contract induced by fraud is not inconsistent with an action for damages for the deceit; * * *. A right of action on a contract and for fraud in inducing plaintiff to enter into such contract may exist at the same time, and a recovery on one of the causes will not bar a subsequent action on the other.' The courts of many states have recognized the rule that a suit on a contract and a suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies."
Id. at 723 (citations omitted), quoting Bankers Trust Co. v. Pacific Employers Ins. Co., 282 F.2d 106, 110 (9th Cir.1960), cert. denied, 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961). The majority's interpretation of the statute means that, in Florida, a lender can sue a borrower for fraud in the inducement based on an oral representation, but a borrower cannot sue a lender for the identical tortious conduct. This could not have been the legislature's intent.
Another recent case that illustrates the difference between fraud and breach of contract is Segal v. Rhumbline International, Inc., 21 Fla. L. Weekly D1982, ___ So.2d ___ [1996 WL 496649] (Fla. 4th DCA, Sept.4, 1996). That case arose from the 1988 sale and lease-back of a 42-foot yacht which was sold to the Segals by a subsidiary of Rhumb Line. Rhumb Line agreed to lease the vessel back from the Segals for seven and one-half years, thus covering essentially all of the sales price and maintenance expenses. The Segals carefully studied the company before completing their purchase and were assured that the company was in good financial condition. Shortly before the sale, Buhler purchased a majority of the stock of the company and became its chairman of the board. The Segals alleged that Buhler was aware of the representations being made to them by various company officials *1186 and knew about the transaction. Specifically, the Segals alleged that the sales staff represented to them that a group of investors headed by Buhler had infused large amounts of capital into the company to insure continued successful operations and that these representations regarding Buhler's investment and involvement were authorized, orchestrated, and promoted by Buhler, who himself published a letter conforming those representations. These representations were made to make the Segals believe that the company was capable of making the payments under the lease-back arrangement and thus to induce the Segals to purchase the vessel, which was overpriced. The representations were false, because Rhumb Line was actually a financially troubled company with cash flow problems. As in this case, such allegedly false representations of fact, i.e. that the seller/lessee had the financial capacity to perform the agreement, induced the plaintiffs to rely to their detriment by entering into the contract. Admittedly, Segal and Acadia do not involve a statute of frauds but they illustrate that such false representations of fact as we have in this case are not part of the underlying agreement. They represent a separate tort.
Finally, the Supreme Court of Florida's excellent analysis of this issue in HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 21 Fla. L. Weekly S447, ___ So.2d ___ [1996 WL 600501] (Fla. Oct. 17, 1996), reaffirms the importance of the distinction between fraud and breach of contract:
[T]he interest protected by fraud is society's need for true factual statements in important human relationships, primarily commercial or business relationships. More specifically, the interest protected by fraud is a plaintiff's right to justifiably rely on the truth of a defendant's factual representation in a situation where an intentional lie would result in loss to the plaintiff.
Id. at 448, at ___, quoting Woodson, 663 So.2d at 1330 (Altenbernd, J., dissenting).
It certainly is true, as the majority says, that a promise or agreement unenforceable for failure to comply with the statute of frauds, cannot be sustained by recasting it as fraud. In other words, a false promise to do "x," which induces a party to enter into a contract for "y," cannot be actionable fraud where the "x" promise requires compliance with the statute of frauds. One cannot reasonably rely to his detriment on an unenforceable promise. A perfect example of this principle is the case relied on by the majority, Canell v. Arcola Housing Corporation, 65 So.2d 849 (Fla.1953). There a seller of subdivision lots allegedly promised purchasers that they would have the right to use a bathing beach that the developer promised to build. The Arcola court held that this was a promise by the seller to create an easement in favor of the purchasers and because it was unenforceable without compliance with the statute of frauds, it would also not support a claim of fraud. This is an excellent rule, though irrelevant to this case. Such a rule has no application where the basis for the fraud is a representation of fact. Representations of fact that form the basis of fraud are not within the statutes of fraud, only promises are. The law does not require representations of fact to be in writing because they are not "enforceable"; they are merely actionable if knowingly false. It is the agreement that has to be in writing.
The majority parades the evisceration of the banking statute of frauds as the horrible that would result from recognition of a fraud cause of action against a bank which misrepresents its ability to loan money. No such threat exists. The dearth of authority shows that the facts of this case are highly unusual, if not unique, and would likely apply only to start-up banks such as FTB who need customers as badly as most borrowers need credit. Recall that the Dietels are not complaining that FTB breached an agreement to lendthe loan was made. Their complaint is that they would not have done business with FTB at all if they had been told the truth. I would reverse on this point.
W. SHARP, GOSHORN and THOMPSON, JJ., concur.
NOTES
[1] Clearly, the representations of Federal Trust Bank and its officers were that they would, and had the inherent ability to, extend credit over and above the $600,000 lending limit which simply amounts to an oral agreement to fund, notwithstanding the fact that the representations also may have been viewed as an inducement.
[1] A further ground for the motion was that the Dietels lacked standing to assert claims belonging to the corporation. It is correct that the Dietels cannot seek damages for losses incurred solely by the corporation; however, this record does not establish that all of the alleged damages were borne by the corporation, none by the Dietels.
[2] At least one Minnesota court has taken the position that the Minnesota statute on which Florida's statute was based was intended only as an effort to prevent borrowers from using an ongoing lending relationship to enforce unwritten agreements for future loans, so that the purpose of the statute is not served by applying the statute to completed loan transactions. See Rural Am. Bank v. Herickhoff, 473 N.W.2d 361 (Minn.Ct.App.1991), affirmed on other grounds, 485 N.W.2d 702 (Minn.1992). The lower court in Herickhoff thus indicated that parol evidence could be used to establish the unwritten terms of the agreement.
[3] See Carlson v. Estes, 458 N.W.2d 123 (Minn.Ct. App.1990) (lender's oral promise not to record mortgage was not a "credit agreement" within the meaning of the statute of frauds provision governing credit agreements); Fronning v. Blume, 429 N.W.2d 310 (Minn.Ct.App.1988) (action based on allegations that bank fraudulently obtained a mortgage was not action on credit agreement, precluding introduction of oral representations made by bank, since action was not action on "agreement to lend or forbear repayment of money," or "to otherwise extend credit, or to make any other financial accommodation," but was action to show no agreement existed).
[4] Based on this language, one commentator has suggested that the statute may have been intended to prohibit only claims for breach of contract. See Jerry M. Gewitz, Impact of Florida Statute § 687.0304 on Lender Liability Actions, LXVI, 6 Fla. B.J. 82 (June 1992).