STOUGHTON TRAILERS,
INC., Plaintiff,

v.

HENKEL CORPORATION, Defendant.

No. 96–C–580–C.

United States District Court.
W.D. Wisconsin.

May 27, 1997.

Thomas Heneghan, Michael, Best & Friedrich, Madison, WI, for Stoughton Trailers, Inc.

W. Stuart Parsons, Quarles & Brady, Milwaukee, WI, for Henkel Corp.

W. Scott McAndrew, Bell, Metzner, Gierhart & Moore, Madison, WI, for Dukes Industries, Inc.

Edward A. Hannan, Milwaukee, WI, for Sheboygan Paint Company.

CRABB, District Judge.

Plaintiff Stoughton Trailers, Inc. decided that it needed to expand and enhance its capacity to paint the trailers it sells to the trucking industry. After evaluating the market, plaintiff settled on a painting process offered by defendant Henkel Corporation. Although defendant did not install the painting system required to apply its Autophoret-

ic® paint chemicals, it discussed the performance specifications of the system with plaintiff. The system never worked properly and plaintiff sued defendant on a variety of contract and tort claims. Defendant has moved for summary judgment on plaintiffs tort claims, contending that the "economic loss" doctrine prevents plaintiff from recovering on those claims. I conclude that the economic loss doctrine bars plaintiff's negligence and strict liability claims but not its intentional tort claims. Accordingly, defendant's motion for summary judgment will be granted in part and denied in part.

Jurisdiction is proper under 28 U.S.C. § 1332. From the parties' proposed findings of fact, I find the following facts to be undisputed.

## UNDISPUTED FACTS

Plaintiff Stoughton Trailers, Inc. is a Wisconsin corporation in the business of manufacturing and selling trailers to the trucking industry. Defendant Henkel Corporation is a Delaware corporation with its headquarters in Gulph Mills, Pennsylvania. Henkel Surface Technologies, formerly known as Parker Amchem, is a division of Henkel Corporation that sells chemicals that can be used to paint, coat and rust proof.

Plaintiff is one of the six largest manufacturers of van trailers in North America. In the late 1980's, plaintiff determined that it needed to expand its trailer painting capabilities. From 1989 through 1992, plaintiff looked for a painting system that would offer a superior paint finish, be environmentally friendly and provide a lower per-unit cost. In 1993, plaintiff selected a process promoted by Parker Amchem that involved the use of Parker Amchem's Autophoretic® chemicals. No other companies sold Parker Amchem's proprietary Autophoretic® chemicals.

During the course of negotiations about the performance specifications necessary for constructing a system that could use the Autophoretic® chemicals, plaintiff received two letters from Parker Amchem. The first letter, dated May 24, 1993, suggested a number of performance conditions that plaintiff should establish in constructing the system and explained that Parker Amchem "will al-ways stand behind the claims we make for our process and the performance specifications we develop jointly with our customers." The second letter, dated August 23, 1993, incorporated several revisions to the suggested performance criteria and agreed to "approve the final design specifications and system layout as proposed by Dukes Industries." Between November 1994 and May 1996, plaintiff purchased over $450,000 of Autophoretic® chemicals from defendant.

Plaintiff hired Dukes Industries, Inc. to serve as the general contractor in the construction of the paint application system. Throughout the construction and installation of the system, Parker Amchem was involved in design specifications and layout. (The extent of that involvement is in dispute.) A representative of Parker Amchem attended weekly building review meetings. Eventually, plaintiff became disillusioned with the work of Dukes Industries, Inc., stopped payments and finished the construction itself. The system was in place by April 1995 and became operational in June 1995.

Problems developed quickly. The biggest one was that the paint was not adhering completely to the trailer parts. Between June 1995 and December 1995, plaintiff painted over 4,000 trailers using the new system and the Autophoretic® chemicals. Because a number of these trailers later lost almost all their paint, plaintiff and Parker Amchem agreed to reanalyze the system. The parties inspected 1,500 trailers in Stoughton's lot that were ready for shipment. The inspection revealed significant adhesion failures on 75% of the units inspected. As a result of the inspection, plaintiff stopped shipping the trailers. From March to May 1996, plaintiff shut down two of its four assembly lines and reworked the inspected trailers by removing the nonadhering Autophoretic® coating and repainting them by hand. Plaintiff is not using the system today.

## OPINION

Plaintiffs complaint sets forth nine claims against defendant: 1) breach of contract; 2) breach of express warranty; 3) breach of

implied warranty of fitness for a particular purpose; 4) breach of implied warranty of merchantability; 5) negligence; 6) fraudulent misrepresentation; 7) negligent misrepresentation; 8) strict liability misrepresentation; and 9) fraudulent representation in violation of Wis.Stat. § 100.18. Plaintiff seeks to recover damages, including the capital costs of the inoperable paint system, its expenses for fulfilling warranty claims filed by its customers, the costs of reworking and repainting 1,556 vehicles, the costs of shutting down production lines, the increased costs in painting its trailers by hand, damage to its reputation and loss of profits and market share caused by reduced production. Defendant argues that claims 5 through 9 should be dismissed because the "economic loss" doctrine precludes plaintiff from suing in tort for damages that are purely "economic" in nature.

## I. *DIVERSITY JURISDICTION AND THE ERIE PRINCIPLE*

I begin with a familiar principle: federal courts hearing cases pursuant to their diversity jurisdiction, 28 U.S.C. § 1332, must apply state substantive law, commonly that of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). (Both sides agree that Wisconsin substantive law governs the resolution of this case.) Where a question of law is unclear, a federal court must predict how the highest court of the state would decide the question today. *See Boland v. Engle*, 113 F.3d 706, 709 (7th Cir.1997); *McGeshick v. Choucair*, 72 F.3d 62, 65 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1834, 134 L.Ed.2d 937 (1996). In making that prediction, decisions of the lower state courts may be helpful. *See King v. Damiron Corp.*, 113 F.3d 93, 95 (7th Cir.1997); *Arnold v. Metropolitan Life Ins. Co.*, 970 F.2d 360, 361 (7th Cir.1992). Interests of comity warrant caution on the part of the federal courts in announcing what state law is; federal courts should be wary of expanding the boundaries of established state jurisprudence. *King*, 113 F.3d at 96.

## II. *ECONOMIC LOSS DOCTRINE*

### A. *General Considerations*

Like many other states, Wisconsin has adopted the "economic loss doctrine," pursuant to which a party bringing a tort claim cannot recover damages that are solely "economic" in character if its claim arises out of a commercial transaction. *See Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis.2d 910, 437 N.W.2d 213 (1989); *see also Rardin v. T & D Mach. Handling, Inc.*, 890 F.2d 24, 28 (7th Cir.1989) (briefly discussing history of economic loss doctrine); *Northridge Co. v. W.R. Grace & Co.*, 162 Wis.2d 918, 925 n. 3, 471 N.W.2d 179, 181 n. 3 (1991) (citing commentary on economic loss doctrine). The basic theory of the economic loss doctrine is straightforward. Commercial entities are capable of bargaining to allocate the risk of loss inherent in any commercial transaction. Courts should assume that parties factor risk allocation into their agreements and that the absence of comprehensive warranties is reflected in the price paid. Permitting parties to sue in tort when the deal goes awry rewrites the agreement by allowing a party to recoup a benefit that was not part of the bargain. *See, e.g., East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 871–75, 106 S.Ct. 2295, 2302–04, 90 L.Ed.2d 865 (1986) (adopting economic loss doctrine for admiralty cases); *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 575 (7th Cir.1990) (commercial disputes should be resolved pursuant to commercial law); *Rardin*, 890 F.2d at 27–28 (commercial parties can protect themselves against risk of financial loss). Generally, this means that where two sophisticated parties have reached an agreement over the sale of a product, the purchaser cannot sue the seller in tort for economic losses suffered when the product does not work. That is a problem that warranties can cover and should be treated under warranty law. *East River*, 476 U.S. at 872, 106 S.Ct. at 2302–03.

Defining "economic loss" is difficult. The Wisconsin Supreme Court has noted that economic loss encompasses direct economic loss and consequential economic loss. *Northridge Co.*, 162 Wis.2d at 926, 471 N.W.2d at 181–82 (citing Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966)). Direct eco-

nomic loss is the "loss of bargain," or the difference between the value of what is received and its value as represented. *Id.* Consequential economic loss includes loss of profits resulting from the inability to use what was bargained for. *Id.* Economic loss can be measured by repair costs, replacement costs, loss of profits or diminution of value. *Id.* at 932–33, 471 N.W.2d at 184.

■ The economic loss doctrine does not apply where a product that one party has purchased from another party causes personal injury or property damage to property other than the product itself. In those instances, the traditional concern of tort law prevails: protecting society from an unreasonable risk of danger. Although commercial entities might be able to allocate the risk of personal injury or other property damage through contract, a baseline rule is necessary to protect the average consumer, who is generally not as capable as a commercial entity of protecting himself against the risk of loss occasioned by a physical injury. An individual in a consumer transaction does not have the bargaining power to allocate the risk of a physical injury in a fair and just manner. And, whereas it might make good financial sense for a commercial entity to purchase insurance to cover the risk of economic losses, it is not financially viable for an individual to take out insurance against personal injury on every product she purchases. The manufacturer is in a far better position than the consumer to understand the risk of placing its products on the market, to spread that risk through its pricing structure and to answer for that loss in a tort suit.

The economic loss doctrine developed in conjunction with strict products liability law as a way courts could honor commercial bargains while still protecting the public from unreasonably dangerous products. Today, the economic loss doctrine has expanded beyond the realm of products liability. How far beyond is the issue in this case. It is necessary to examine what Wisconsin courts have had to say about the economic loss doctrine to develop a better understanding whether the state supreme court would apply the doctrine in this case.

### B. *Wisconsin Application*

The Wisconsin Supreme Court first adopted the economic loss doctrine in *Sunnyslope Grading, Inc.,* 148 Wis.2d 910, 437 N.W.2d 213. The case offers a textbook example of a situation in which the economic loss doctrine should apply. The plaintiff was a grading and excavation contractor who purchased a series of backhoes from a construction equipment dealer. With each backhoe, the plaintiff received a manufacturer's warranty limited to fixing defects arising within six months or 1,000 hours of use. The backhoes developed problems that were fixed under the warranty, but the plaintiff was unsatisfied and sued the manufacturer for "additional replacement parts, labor charges, down-time expenses and lost profits." *Id.* at 914–15, 437 N.W.2d at 215. The state supreme court traced the development of the economic loss doctrine in other jurisdictions and concluded that "a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly, as here, where the warranty given by the manufacturer precludes the recovery of such damages." *Id.* at 921, 437 N.W.2d at 217–18.

The court's holding has several key elements. First, the parties were in privity because of the contract created by the warranty. Second, the parties were both commercial entities. Third, the contract involved a product rather than a service. (Whether this element was central to the court's holding will be discussed in more detail shortly). Fourth, the economic loss suffered by the plaintiff arose from damage to a product that was the subject of the parties' contract. In such situations, it is reasonable to assume that the parties intended their contract to encompass the entire array of rights and responsibilities between the parties. Allowing the plaintiff to sue for extra damages through tort would thwart the purpose of allocating risk through contract.

Although the court adopted the economic loss doctrine in *Sunnyslope,* it left the boundaries of that doctrine fuzzy. Should the doctrine apply if the parties were not in privity? What if the parties had unequal bargaining power? What if the economic

loss arose from poor service rather than a defective product? Since *Sunnyslope* these questions have been playing out in the state courts of appeals and in the federal district and appellate courts, with a variety of answers.

The state supreme court has returned to the economic loss doctrine only once after *Sunnyslope*. In *Northridge Co. v. W.R. Grace & Company*, 162 Wis.2d 918, 471 N.W.2d 179, an owner of several shopping malls sued the defendant, a manufacturer of fireproofing material, after a general contractor had installed fireproofing material in plaintiff's malls that plaintiff discovered later contained asbestos. The defendant raised the economic loss doctrine in its defense. The supreme court found the doctrine inapplicable because the plaintiff was not claiming damages related to the product's failure to perform as anticipated, but was seeking damages for harm to the building and its occupants caused by the toxic substances released into the building's environment by the asbestos. *Id.* at 937–38, 471 N.W.2d at 186. The damage was the type of safety hazard that tort law was designed to address; therefore, public safety justified recognizing plaintiff's tort claims as valid, although the type of damages plaintiff was seeking (repair costs, replacement costs, decreased value and lost profits), were economic losses. *Id.* at 934, 471 N.W.2d at 184.

*Northridge Co.*, cemented the fourth key element of *Sunnyslope*, namely that where defective products cause personal injury or damage to property other than the product itself, those injured can sue in tort even for losses considered to be "economic" in nature. *See also Tony Spychalla Farms, Inc. v. Hopkins Agr. Chemical Co.*, 151 Wis.2d 431, 444 N.W.2d 743 (Ct.App.1989) (plaintiff allowed to sue for economic losses where defendant's defective chemical product caused damage to plaintiff's potato crops); *but see Midwest Helicopters Airways v. Sikorsky Aircraft*, 849 F.Supp. 666 (E.D.Wis.), *aff'd*, 42 F.3d 1391 (7th Cir.1994) (economic loss doctrine barred suit by helicopter owner against helicopter manufacturer for damages suffered when tail rotor drive system failed and helicopter crashed); *Midwhey Powder Co. v.*

*Clayton Industries*, 157 Wis.2d 585, 460 N.W.2d 426 (Ct.App.1990) (defective turbines an integral part of product purchased by plaintiff, thus entire product was defective and economic loss doctrine applied).

Although *Northridge* provides some insight into the state supreme court's application of the economic loss doctrine, *Sunnyslope* remains the seminal case on the issue in this state. It provides the framework for analyzing economic loss cases and for deciding whether the Wisconsin Supreme Court would apply the economic loss doctrine in any particular case.

### 1. *Privity of contract*

■ In *Sunnyslope*, the court found it critical that the parties were in privity of contract. 148 Wis.2d at 915–16, 437 N.W.2d at 216. Would the supreme court extend *Sunnyslope* and the economic loss doctrine to situations in which the parties lacked privity? The Court of Appeals for the Seventh Circuit thinks it would. *See Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1300 (7th Cir.1991) ("[T]here is now substantial evidence that Wisconsin would decline in all circumstances to allow a negligence suit for the recovery of only economic damages, even when there is no contractual relationship between the parties"); *Miller*, 902 F.2d at 575. The state court of appeals thinks not. *See Hap's Aerial Enterprises v. General Aviation*, 173 Wis.2d 459, 463 n. 4, 496 N.W.2d 680, 682 n. 4 (Ct.App.1992) ("The Wisconsin Supreme Court has not yet declared [*Midwest Knitting*] to be the law of this state, and we think that when presented squarely with the question, it will not.").

It is unnecessary to resolve the importance of privity in this case. Plaintiff and defendant acknowledge that they had a contract, although they dispute the extent of the terms of that contract. Plaintiff asserts that the contract covered design specifications and layout. Defendant argues that the contract pertained merely to the sale of the paint chemicals. In either case, the parties negotiated an agreement to enter into a long-term relationship. Plaintiff was not going to be able to purchase the chemicals it needed for its paint system from anyone but defendant.

This was not a situation in which plaintiff was picking up several cans of paint from the local paint store to paint a garage. Whatever the scope of the parties' agreement, they had a contractual relationship that brings them within any privity required by *Sunnyslope*.

### 2. Commercial entities

Both plaintiff and defendant are large, commercially sophisticated parties. Plaintiff was capable of assessing the risks of economic losses that might occur if the paint system did not work. If it did not bargain for assurances from defendant that the paint system would work, perhaps it should have. Plaintiff cannot fall back upon tort law to provide a remedy where it should have secured that remedy through commercial contract law. Plaintiff had the bargaining power to extract a warranty from defendant and it was well aware of the risk of loss associated with its committing to defendant's Autophoretic® system. It asserts repeatedly in its briefs that it would not have entered into this arrangement with defendant if not for the assurance letters defendant sent on May 24, 1993 and August 23, 1993.

On at least the first two elements of the *Sunnyslope* holding, plaintiff falls squarely within the economic loss doctrine. If plaintiff is to avoid the application of that doctrine, it must show either that the Wisconsin Supreme Court would not apply it to a situation involving a service rather than a product or that the damage to its trailers was damage to other property within the meaning of *Northridge Co.*

### 3. Service versus product

■ Plaintiff contends that the contract at issue involved services rather than a product and that the economic loss doctrine does not apply to contracts for services. This court held otherwise in *Wausau Paper Mills Co. v. Chas. T. Main, Inc.*, 789 F.Supp. 968 (W.D.Wis.1992), finding that the economic loss doctrine adopted in *Sunnyslope* was applicable to a suit for services to be performed under a contract between two sophisticated parties. *Id.* at 971–974 (citing cases in other jurisdictions applying economic loss doctrine

to contracts for services). *Sunnyslope* made no distinction between products and services. *Id.* at 973. Sophisticated parties are just as capable of allocating the risk of economic loss in a contract for services as in a contract for a product.

As plaintiff points out, there is some tension between this court's decision in *Wausau Paper* and a line of Wisconsin cases beginning with *A & E Investment Corp. v. Link Builders, Inc.*, 62 Wis.2d 479, 214 N.W.2d 764 (1974), in which Wisconsin courts have permitted recovery for economic loss resulting from a defendant's negligent performance of services. In *Sunnyslope*, the court distinguished *A & E Investment Corp.* by explaining that the case had not involved the purchase of a product or a situation in which the parties were in privity of contract. 148 Wis.2d at 918, 437 N.W.2d at 216. However, the court said nothing about whether it would now apply the economic loss doctrine to situations where sophisticated commercial parties had struck a deal for the provision of services.

*A & E Investment Corp.*, 62 Wis.2d 479, 214 N.W.2d 764, is distinguishable from this case because it involved a situation in which the plaintiff and defendant were not in privity of contract. If the court had denied the plaintiff the opportunity to sue for negligence, that plaintiff would have been denied a remedy. In *A & E Inv. Corp.*, the plaintiff operated a supermarket in a building designed by the defendant architectural firm. It sued defendant for negligent design and supervision of the building's construction after the building's floor settled, became uneven and eventually became untenantable. The plaintiff sought damages for lost profits, loss of equipment and merchandise, and loss of reputation and good will. *Id.* at 483, 214 N.W.2d at 766. The court held that plaintiff could sue defendant for negligence because the defendant owed a duty of due architectural care not only to the plaintiff but to the public at large. *Id.* at 488–89, 214 N.W.2d at 769. If successful in proving negligence and causation, the plaintiff could recover damages for economic loss as long as those losses were not barred by the public policy considerations that Wisconsin courts apply after

cause-in-fact has been established. *Id.* at 490, 214 N.W.2d at 770.

*Hap's Aerial Enterprises,* 173 Wis.2d 459, 496 N.W.2d 680, is another case cited by defendant that is distinguishable from this one. The plaintiff purchased an airplane that had been inspected by a company hired by the seller to conduct a pre-buy inspection. The inspection showed no problems and the plaintiff bought the plane. Later, when the plaintiff intended to resell the plane, it discovered problems it believed the initial inspection should have identified. The plaintiff sued the inspection company for repair costs and lost interest on the sale. *Id.* at 461, 496 N.W.2d at 681. Relying on *A & E Inv. Corp.,* the court of appeals found that a party who negligently provides services to one person may be liable for economic losses resulting to a third person, unless public policy considerations require otherwise. *Id.* at 467–68, 496 N.W.2d at 684.

This case differs from *A & E Inv. Corp.* and *Hap's Aerial Enterprises* in that plaintiff and defendant in this case were negotiating a deal directly. Unlike the plaintiffs in *A & E Inv. Corp.* and *Hap's Aerial Enterprises,* plaintiff had an opportunity to protect itself from defendant's poor work through contractual remedies. Any duty defendant had to provide due engineering care did not disappear as a result of the parties' deal. Like the defendants in *A & E Inv. Corp.* and *Hap's Aerial Enterprises,* defendant had a duty not to take an act that posed an unreasonable risk of harm to someone. The difference is that the protection from injury that tort law provides through the imposition of such duties of care becomes subsidiary to the protection that contract law provides against parties changing the terms of an agreed-upon deal. As a matter of policy, in situations in which parties have allocated risk through a contract, the economic loss doctrine teaches that it is more advantageous to uphold the bargain than to allow an end-run around the bargain through tort law. Defendant may have breached its duty of due care in this situation, but even if it did, plaintiff cannot seek remedies for that breach that it could have under its contract. *A & E Inv. Corp.* and *Hap's Aerial Enterprises* are not directly on point and do not provide a clear indication that the court would go the same way if presented with this case in which the parties were in privity of contract.

The decision of the court of appeals in *Milwaukee Partners v. Collins Engineers, Inc.,* 169 Wis.2d 355, 485 N.W.2d 274 (Ct. App.1992) gives more insight into whether the supreme court would apply the economic loss doctrine to defective services. Milwaukee Partners hired Collins Engineers to inspect a building for structural damage before Milwaukee Partners purchased it. Collins Engineers found no significant problems and Milwaukee Partners bought the building. When Milwaukee Partners wanted to sell the building later, it discovered structural problems and sued Collins Engineers in negligence for lost profit in the sale of the building, lost rental income and other miscellaneous economic damage. The court held that Milwaukee Partner's tort claims were valid because Collins Engineers owed Milwaukee Partners a common law duty of due engineering care in fulfilling its contractual duties, a duty similar to that of all professionals in providing services. *Id.* at 363, 485 N.W.2d at 277. According to the court, the contract did not create the duty of due care, it merely furnished the opportunity for exercise of that due care. *Id.* at 362, 485 N.W.2d at 276–77 (citing *Landwehr v. Citizens Trust Co.,* 110 Wis.2d 716, 723, 329 N.W.2d 411, 414 (1983)); *but see Madison Newspapers, Inc. v. Pinkerton's Inc.,* 200 Wis.2d 468, 545 N.W.2d 843 (Ct.App.1996) (no independent common law duty to use reasonable care in providing professional security guard services; responsibilities running between parties encapsulated in parties' contract). Further, the court explained that "unless public-policy considerations against liability intervene, professionals in Wisconsin are liable in tort for economic damages irrespective of whether there is a contractual relationship between the parties." *Id.* at 363–64 n. 3, 485 N.W.2d at 277 n. 3.

■ Plaintiff contends that defendant is like the defendant in *Milwaukee Partners* because defendant owed plaintiff an independent common law duty of due engineering

care in supervising the plans for the construction of the paint system. Although defendant does resemble the defendant in *Milwaukee Partners* in some ways, I am not convinced the Wisconsin Supreme Court would apply the rationale to this case. (I am not convinced either that a paint system developer like defendant is a professional with the same attendant duties as the engineering firm in *Milwaukee Partners*.) In *Milwaukee Partners*, the court found that the defendant owed the plaintiff a common law duty of due engineering care. It is not surprising the court reached that result. In *A & E Inv. Corp.*, the court was emphatic about the duties that professionals owe to the public at large. 62 Wis.2d at 488–89, 214 N.W.2d at 769. Moreover, under Wisconsin tort law everyone owes everyone else a common law duty of care. *See Rockweit v. Senecal,* 197 Wis.2d 409, 419–21, 541 N.W.2d 742, 747–48 (1995). If a person can foresee that his conduct poses an unreasonable risk of harm to someone else, he should not take that action, whether the action is the subject of a contract or not. Thus, as long as Collins Partners could have foreseen an unreasonable risk of harm to anyone from its carelessness in inspecting the building, it should have taken the steps to avoid that unreasonable risk of harm.

 But the finding of a duty should not end the economic loss inquiry as it did in *Milwaukee Partners*. Just because a party owes a common law duty of care to perform services appropriately does not mean that sophisticated commercial parties cannot reallocate such duties through contract. The economic loss doctrine is not based on the idea that if the parties have a contract, all duties dissipate. Rather, certain contractual agreements overrule the common law duties of care that tort law establishes. Sometimes they will not supersede the common law rights, if there is sound reason that they should not. For example, where the parties have unequal bargaining power, it is unjust to presume that parties intended to relinquish their common law tort remedies by contracting for the provision of certain services. It would be inequitable to protect lawyers to be sued for malpractice simply because they had negotiated a contingent fee agreement with a client. Although the traditional reason for allowing lawyers to be sued in malpractice is that professionals owe a special common law duty of care that nonprofessional individuals do not owe to the public at large, the real reason is that the typical individual is not in a position to bargain for a deal that includes the relinquishment of the right to sue for malpractice. Courts are reluctant to find that a party has waived tort remedies without explicit evidence that the party knew what it was doing when it agreed to the release. *See, e.g., Yauger v. Skiing Enterprises, Inc.,* 206 Wis.2d 75, 557 N.W.2d 60 (1996) (exculpatory clause in application for season ski pass was void as against public policy because it was not conspicuous and did not explicitly waive applicant's right to bring negligence action).

Where the parties are sophisticated, experienced entities of equal bargaining power, however, courts do not have to guard the door to tort remedies as zealously. They may presume that the parties have a clearer understanding of their full array of rights and responsibilities and that the contract price reflects the parties' allocation of those rights and responsibilities. Here, where the parties are each sophisticated commercial entities who had the opportunity to bargain for the full array of responsibilities that each party would assume with respect to the painting system, it would thwart the purpose of commercial contract law to allow plaintiff to sue on its negligence claims. Although the Wisconsin Supreme Court has not reached that explicit holding in a case to date, I am satisfied that it would reach that result if presented with the question today.

*4. Damage to other property*

Plaintiff has one last argument. Plaintiff argues that it is like the plaintiff in *Northridge Co.,* because it suffered economic loss as a result of damage to property other than the paint system or chemicals themselves, a type of damage not covered by the economic loss doctrine. According to plaintiff, its economic loss resulted from damage to its trailers occasioned by the non-adhering paint.

Plaintiff mischaracterizes its situation. This is not a case like *Northridge Co.*, in which the defective product was emitting toxic substances that made an entire building hazardous to public health. In *Northridge Co.*, the fireproofing material was working as intended; it was the inclusion of asbestos that caused the economic losses at issue. Here, the painting system did not work as plaintiff thought it would. The paint did not adhere to the trailers and plaintiff was left to repaint the trailers by hand. Although the failure of the paint to adhere could be considered "damage" in the sense that the trailers had to be repainted, this is not the "other property damage" envisioned by the economic loss doctrine. Plaintiff was able to repaint the trailers and ship them out anew. They were not damaged permanently by the defective paint system as were the plaintiffs potato crops in *Tony Spychalla Farms,* 151 Wis.2d 431, 444 N.W.2d 743. Plaintiff is suing because the paint system does not function as plaintiff wants and plaintiff has lost considerable money as a result. That is something plaintiff could have foreseen before entering its agreement with defendant. Therefore the consequential losses are covered by the economic loss doctrine.

### C. *Intentional Tort Claims*

■ Plaintiffs intentional tort claims (fraudulent misrepresentation and fraudulent representation in violation of Wis.Stat. § 100.18) are a different matter. Although it makes sense to allow parties to allocate the risk of mistakes or accidents that lead to economic losses, it does not make sense to extend the doctrine to intentional acts taken by one party to subvert the purposes of a contract. Although theoretically parties could include contractual provisions discussing the allocation of responsibility when one party intentionally lies or misleads the other, it would not be conducive to amicable commercial relations to require parties to include such clauses in contracts. Expressing such a basic lack of trust in the other party would be likely to sour a deal from the start.

A party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract. Public policy is better served by leaving the possibility of an intentional tort suit hanging over the head of a party considering outright fraud. Although the Wisconsin Supreme Court has not addressed whether the economic loss doctrine extends to intentional torts, I am satisfied that it would not extend the doctrine that far. Accordingly, defendant's request for summary judgment will be denied on the ground that plaintiffs intentional tort claims are barred by the economic loss doctrine.

### III. *WIS.STAT. § 100.18— FRAUDULENT REPRESENTATION*

■ Plaintiffs ninth claim alleges that defendant violated Wis.Stat. § 100.18 by engaging in fraudulent representation. The elements of a § 100.18 claim include:

1) an advertisement, announcement, statement or representation;

2) made with the intent to sell a product, service or anything;

3) which contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

Defendant asserts that plaintiff has not alleged the facts necessary to state such a claim and, in any case, is not the type of entity entitled to protection under § 100.18. Defendant's arguments requires little discussion. Defendant's first point is one properly raised on a motion to dismiss; the undisputed facts add little to the resolution of the argument. Contrary to defendant's urgings, plaintiff has adequately set forth the basis of its § 100.18 claim in its complaint. Plaintiff asserts that the first prong is met by defendant's representations, including the assurance letters sent in May and August of 1993. The second prong is met because defendant made those representations with the intent to sell its paint chemicals. The third prong remains to be proven, but plaintiff has alleged that defendant's representations were misleading. That is all that is required to state a claim under § 100.18.

■ Defendant's second argument is unpersuasive. Whether the state legislature passed § 100.18 with the primary intention of protecting consumers as opposed to commercial entities makes no difference. The plain

language of the statute contains no indication that plaintiff should be prevented from availing itself of the law's protection merely because it is a sophisticated business. The state supreme court has permitted commercial entities to recover under this statute in the past. *See Gorton v. American Cyanamid Co.*, 194 Wis.2d 203, 533 N.W.2d 746 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 753, 133 L.Ed.2d 701 (1996) (commercial entity can recover attorney fees under § 100.18). There is *no reason to believe the court would* do otherwise in this case.

### ORDER

IT IS ORDERED that the motion for summary judgment of defendant Henkel Corporation is GRANTED with respect to plaintiff Stoughton Trailers' fifth, seventh and eighth claims and DENIED with respect to plaintiff's sixth and ninth claims.