**CSY LIQUIDATING CORPORATION, Plaintiff–Appellant,**

v.

**HARRIS TRUST AND SAVINGS BANK, Defendant–Appellee.**

No. 98–2023.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1998.

Decided Dec. 3, 1998.

Daniel R. Shulman (argued), Shulman, Walcott & Shulman, Minneapolis, MN, for Plaintiff–Appellant.

Daniel W. Weil, Chapman & Cutler, Chicago, IL, Christina L. Sciabica, Grippo & Elden, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

Harris Bank issued an $8 million line of credit to CSY, a manufacturer of barges, on a secured basis. CSY defaulted, and Harris sold CSY's promissory notes to Trinity, a competitor of CSY, for the full amount that CSY owed the bank. Trinity demanded payment from CSY and threatened to foreclose on the security if payment was not forthcoming. The demand and threat precipitated negotiations that ended in CSY's selling its assets to Trinity. In this diversity suit against the bank, CSY (not the barge manufacturer, but the shell of CSY that remained after the assets were sold) claims that the bank violated Illinois law, mainly by conspiring with Trinity to bring about the sale of CSY's assets for less than their true value. The district court granted summary judgment for the bank.

▮ Trinity had agreed to give the bank $250,000 for a two-week exclusive right to decide whether to buy CSY's promissory

notes, contingent however on Trinity's success in acquiring control of CSY. To facilitate the takeover and thus earn the $250,000, the bank gave Trinity financial information about CSY that the bank had acquired in the course of its relationship with its borrower, including a loan history and an appraisal of CSY's assets. Armed with this information, Trinity was able (so CSY argues, we may assume correctly) to drive a hard bargain with CSY for the purchase of its assets. CSY does not question the bank's right to sell the promissory notes; the sale of a defaulted loan is a conventional method of collection. And since the objective was proper, the sale agreement was actionable as a conspiracy only if the implementation of the agreement involved an unlawful act, *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (Ill.1994); *Buckner v. Atlantic Plant Maintenance, Inc.*, 182 Ill.2d 12, 230 Ill.Dec. 596, 694 N.E.2d 565, 571 (1998); *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991); *Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 337 S.E.2d 744, 748 (1985), such as threatening to break the borrower's kneecaps if he didn't pay off the loan. Nothing so garish is involved here; rather, CSY argues that the bank, to induce Trinity to pay it the full amount of its promissory notes, violated the Illinois Banking Act.

The Act, so far as it bears on this case, forbids a bank to "disclose to any person, except to the customer or his duly authorized agent, any financial records relating to that customer of that bank unless … the bank is attempting to collect an obligation owed to the bank and the bank complies with the provisions of Section 2I of the Consumer Fraud and Deceptive Business Practices Act." 205 ILCS 5/48.1(c). Section 2I forbids any person to "attempt to collect an obligation by communicating in any way with an employer with regard to the obligation owing by one of his employees" unless the employee has been in default for at least 30 days and the creditor has given the employee at least 5 days' notice of its intention to communicate with the employer. 815 ILCS 505/2I. CSY reads the Banking Act in light of the Consumer Fraud Act to forbid a bank to disclose a borrower's financial records to anyone other than the borrower's employer, and then only if the 30–day and 5–day limitations in the Consumer Fraud Act are observed.

■ The Banking Act does not create a private right to damages for a violation of the privacy section; the only remedies for such a violation that are specified in the Act are criminal penalties and other public penalties. See 205 ILCS 5/48(7), (9), 5/48.1(e), (f). And a careful analysis in *Stern v. Great Western Bank*, 959 F.Supp. 478, 484–85 (N.D.Ill.1997), concludes that the Illinois courts would not construe the Act to imply such a right either. This raises the interesting question whether the tort of conspiracy can be used to create the very remedy for a statutory violation that the legislature did not want created, provided only that the defendant committed the violation in concert with someone else. Certainly the orthodox definition of the tort ("a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not itself criminal or unlawful, by criminal or unlawful means," *Hechler Chevrolet, Inc. v. General Motors Corp., supra*, 337 S.E.2d at 748; see also *Adcock v. Brakegate, Ltd., supra*, 206 Ill.Dec. 636, 645 N.E.2d at 894; *Operation Rescue–National v. Planned Parenthood of Houston & Southeast Texas, Inc.*, 975 S.W.2d 546, 553 (Tex.1998); *Marshak v. Marshak*, 226 Conn. 652, 628 A.2d 964, 970–71 (1993)) allows for this possibility. But we cannot find a case that actually discusses the propriety of using the conspiracy tort to create a private damages remedy for the violation of a statute that contains no private remedies without considering whether the addition of such a remedy would promote the policy of the statute rather than interfere with a carefully calibrated system of remedies or upset a legislative compromise. We doubt that the tort has so ambitious an office, which would put it on a collision course with legislative intent. But we need not run this particular hare to the ground. CSY must lose even if a concerted violation of the privacy provision of the Banking Act is actionable as a civil conspiracy. It must lose because the Banking Act does not say—and could not mean—that a

bank may disclose a borrower's financial records only to the borrower's employer.

The Act authorizes the bank to disclose a borrower's financial records if the bank is trying to collect a loan, except that disclosure to the borrower's employer must comply with the provisions of the Consumer Fraud Act. Those provisions did not come into play here because Trinity was not CSY's employer. Read as CSY would have us read it, the Banking Act provides *less* protection to employees than to other debtors, for on that reading it totally forbids disclosure (without the borrower's consent, which is likely to be withheld when the borrower has defaulted and is being dunned for payment) to anyone *other than* a borrower's employer. Worse, the reading would toss an enormous monkey wrench into the collection process—to the ultimate detriment of borrowers, since the cost of defaults is reflected in interest rates. A bank forbidden to provide information about a defaulting borrower's finances to a law firm, a collection agency, or a buyer of the loan would be limited to using its own employees to collect defaulted loans, and often that would be less efficient than using nonemployee agents or other third parties. Confronted at argument with this implication of his position, CSY's lawyer told us that the Banking Act has an implicit exception for disclosure to agents. So he wants to interpolate a term into the Act while at the same time arguing that his interpretation is based on the Act's "plain meaning." And the interpolated term would create an arbitrary distinction between agents and purchasers. For it makes no difference to the policy behind the privacy provision of the Illinois Banking Act whether the bank *hires* a collection agency to collect a defaulted loan or sells the loan to the collection agency.

There was nothing exploitive, moreover, let alone invasive of the interest in privacy that the Act seeks to protect (on which see *People v. Jackson*, 116 Ill.App.3d 430, 72 Ill.Dec. 153, 452 N.E.2d 85, 88, 90 (Ill.App.1983)), about the bank's assisting Trinity to acquire CSY's assets by giving Trinity information about those assets. CSY had defaulted. The bank was entitled to collect the full amount that CSY owed it. A legitimate method of collection was to sell CSY's promissory notes. It was in the bank's interest to locate the potential buyer of the notes to whom CSY's assets would be worth the most, for that would be the buyer who would pay the most for a loan secured by those assets. To find that buyer, the bank had to be prepared to furnish potential buyers, such as Trinity, with credible information concerning the value of CSY's assets. Naturally CSY would have preferred to deal with a less well informed potential buyer; but we cannot imagine why the law would want to protect such an interest, the interest in exploiting a buyer's ignorance. There is no basis in case law for CSY's interpretation of the Illinois Banking Act (there are no reported cases dealing with the provision on which CSY relies, that is, the collection exception to the borrower's right of privacy), and we have no hesitation in predicting that the Supreme Court of Illinois would reject it if given the opportunity.

■ CSY also accuses the bank of intentional interference with a contract. CSY had been owned by a company known as MHI, which sold it to another company, SLSI, and received in return a promissory note for the purchase price. The sale agreement forbade SLSI to sell its own assets or that of any subsidiary (such as the newly acquired CSY) without MHI's consent. But when Trinity threatened to foreclose its security interest in CSY's assets, SLSI, in breach of its agreement with MHI, sold CSY's assets to Trinity. Trinity thus interfered (CSY argues) with the contract between MHI and SLSI, and Harris as Trinity's coconspirator is also liable for the interference.

■ The harm if any from the interference was to MHI, which is not a party to this suit. CSY can't get damages for a harm suffered by someone else. It claims that it was harmed indirectly because if SLSI had honored its contract with MHI, and the latter had refused to permit the sale of CSY's assets at what CSY contends would have been a distress sale, CSY would have been better off. But the tort of intentional interference with contract is meant to protect the parties (including third-party beneficiaries, assignees, and others having the rights of

parties) to contracts, *Strosberg v. Brauvin Realty Services, Inc.*, 295 Ill.App.3d 17, 229 Ill.Dec. 361, 691 N.E.2d 834, 845 (Ill.App. 1998); *Organization of Minority Vendors, Inc. v. Illinois Central Gulf R.R.*, 579 F.Supp. 574, 605 (N.D.Ill.1983); *Restatement (Second) of Torts* § 766, comment p (1979), rather than persons who might be harmed by a breach of someone else's contract. The doctrine of "economic loss" rules out recovery for such indirect losses—losses for example to customers when a store is burned down by the negligence of a third party. *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982); *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, ——, 117 S.Ct. 1783, 1786, 138 L.Ed.2d 76 (1997); *Valenti v. Qualex, Inc.*, 970 F.2d 363, 369–70 (7th Cir.1992); *Rardin v. T & D Machine Handling, Inc.*, 890 F.2d 24, 28 (7th Cir.1989). A tort may have indirect consequences that are beneficial—for example, to competitors of the store that is burned down—as well as harmful, and since the tortfeasor is not entitled to sue for the benefits, neither should he have to pay for the losses. *Id.* at 29.

The puzzle is why MHI has not sued either CSY for interference with its contract with SLSI or SLSI itself for breach of contract. The solution to the puzzle is complex, but interesting. Remember that MHI had bought CSY and then sold it to SLSI. It had used borrowed money to acquire CSY; and its creditor, Morgan Guaranty Trust Company, had extracted an agreement from it not to sue SLSI without Morgan's written consent. SLSI had given MHI a promissory note in payment for CSY and pledged CSY's assets as security, and Morgan wanted a free shot at foreclosing on those assets should MHI default on Morgan's loan to it and Morgan seek to enforce SLSI's note, which MHI had pledged as security for Morgan's loan.

Morgan refused to consent to MHI's suing SLSI—whereupon MHI reacquired CSY, now an empty shell, from SLSI and directed CSY to bring the present suit. CSY is not the only empty shell; MHI and SLSI are empty shells too. As it happens, all three are owned by the same two people, the brothers Joseph and Milton Dresner. MHI has nothing to gain by suing SLSI, since SLSI is both assetless and owned by MHI's owners, and furthermore the suit is barred by the agreement with Morgan. The Dresners have sought to leap all these hurdles by having their creature CSY sue an innocent but solvent third party, the Harris Bank.

The suit was properly dismissed.

Affirmed.