**RAYTHEON COMPANY and Raytheon Appliances, Inc., Plaintiffs,**

v.

**McGRAW-EDISON COMPANY, INC., Defendant.**

No. 96–C–691.

United States District Court, E.D. Wisconsin.

Oct. 13, 1997.

Richard J. Lewandowski, Todd Palmer, DeWitt, Ross & Stevens, Madison, WI, for plaintiffs.

Dale E. Stephenson, Squire, Sanders & Dempsey, Cleveland, OH, for defendant.

## DECISION AND ORDER

RANDA, District Judge.

This action asserts liability under the Resource Conservation and Recovery Act ("RCRA") and the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as well as pendent state law theories of recovery. The matter comes before the Court on defendant's motion to dismiss the entire case for failure to state a claim. For the following

reasons, the motion to dismiss is denied-in-part and granted-in-part.

## I

In October, 1979, Raytheon Company and/or Raytheon Appliances, Inc., on behalf of itself and its subsidiary, Speed Queen Company (collectively, "Raytheon"), entered into a contract with McGraw–Edison Company, Inc.'s Laundry Products Division and Kitchen Appliances Division ("McGraw–Edison") for the purchase of an aluminum die casting operation in Omro, Wisconsin.[1] (Am. Compl. at ¶ 8.) Sixteen years later, in the summer of 1995, Raytheon began construction of a new loading dock on the property. (Am. Compl. at ¶ 10.) During construction, Raytheon discovered contamination in the underlying soil. (Am. Compl. at 11.) Raytheon notified the Wisconsin Department of Natural Resources (the "WDNR") of the contamination. (Am. Compl. at ¶ 12.) The WDNR responded with a letter dated July 3, 1995, directing Raytheon to investigate the contamination and develop a clean-up plan. (Am. Compl. at ¶ 13.) The soil already excavated remained stockpiled on site. (Am. Compl. at ¶ 14.) Soil analyses revealed the presence of polychlorinated biphenyls ("PCBs") and other contaminants in the excavated soil, and similar contaminants were found in the remaining soil on the property. (Am. Compl. at ¶ 15.) Upon investigation, Raytheon discovered that McGraw–Edison had disposed of various "hazardous substances" on the property prior to Raytheon's purchase of the same. (Am. Compl. at ¶ 17.) Raytheon, not being responsible for the disposal of contaminants on the property, wants McGraw–Edison to pay for the cost of cleaning up the property.

Raytheon alleges that, at the time of purchase, McGraw–Edison knew about its prior dumping activities on the property and should have cleaned up the mess and/or disclosed the same to Raytheon. Because McGraw–Edison failed to do so, Raytheon seeks prospective injunctive relief under

---

1. The underlying facts in this case are drawn from the Amended Complaint and are assumed true for purposes of this motion only.

RCRA, direct cost recovery under CERCLA § 107, contribution under CERCLA § 113, and compensatory damages under several pendent state law claims. In response, McGraw–Edison moves to dismiss the entire lawsuit for failure to state a claim.

In considering whether to grant a 12(b)(6) motion, the Court "must accept as true all well-pleaded factual allegations contained in the plaintiff's complaint, viewing all reasonable inferences in the light most favorable to the plaintiff." *McCulley v. U.S. Dept. of Veterans Affairs*, 851 F.Supp. 1271, 1276 (E.D.Wis.1994); *see also, Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984); *Mescall v. Burrus*, 603 F.2d 1266, 1269 (7th Cir.1979). The complaint "must set forth factual allegations adequate to establish the essential elements of [the] claim...." *McCulley*, 851 F.Supp. at 1276 (citations omitted). The Court may dismiss the case only if "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.; see also, Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Mescall*, 603 F.2d at 1269.

## II

Raytheon asserts a RCRA citizen suit under 42 U.S.C. § 6972(a)(1)(B).[2] McGraw–Edison argues that Raytheon cannot bring suit under this section because (1) contaminated soil that has already been removed cannot pose an "imminent and substantial endangerment to health or the environment," and (2) Raytheon is impermissibly seeking a private remedy under the guise of a RCRA citizen suit.

Of course, McGraw–Edison is correct that the contaminated soil already exca-

vated and removed from the property no longer poses an "imminent and substantial endangerment to health or the environment." Because a private party may not recover past clean-up costs under RCRA, this aspect of McGraw–Edison's argument is valid. *See, Meghrig v. KFC Western, Inc.*, 516 U.S. 479, ——, ——, 116 S.Ct. 1251, 1254, 1256, 134 L.Ed.2d 121 (1996). However, Raytheon's RCRA suit does not seek recovery of the costs associated with the soil already excavated and removed. Those costs are sought by way of Raytheon's CERCLA claims. Raytheon's RCRA suit seeks prospective injunctive relief for contamination of the soil still remaining on the property. Raytheon alleges that the contaminants in the remaining soil may pose an imminent and substantial threat to persons or the environment. (Am. Compl. at ¶¶ 15, 28.) The citizen suit provision of RCRA "implies that there must be a threat which is present *now*, although the impact of the threat may not be felt until later." *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir.1994); *see also, Meghrig*, 516 U.S. at ——, 116 S.Ct. at 1255. "A finding of imminency does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present." *Price*, 39 F.3d at 1019. Raytheon's allegations meet this test. At the very least, a question of fact is presented that cannot be resolved on a 12(b)(6) motion. *Cf. City of Toledo v. Beazer Materials and Services, Inc.*, 833 F.Supp. 646, 654 (N.D.Ohio 1993) ("Given that the [plaintiff] has alleged that the ongoing presence of hazardous wastes disposed of by the defendants presents an imminent and substantial endangerment, and that this Court must accept [such] allegations as true, [the defendants have] no colorable argument that the ... action should be dismissed.").[3]

---

2. Section 6972(a)(1)(B) reads as follows: "Any person may commence a civil action ... against any person ... including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

3. McGraw-Edison points to soil analyses allegedly showing that no imminent and substantial endangerment exists. First, the Court is not allowed to look outside the well-pleaded factual allegations of the complaint when deciding a motion to dismiss. Second, even if the Court were to consider such information, the Court cannot consider it dispositive at this early stage of the litigation. A detailed explanation of the results of these analyses, as well as any contradictory analyses, is necessary before a conclusion

▇ To bring a RCRA citizen suit, a plaintiff must also act as a "private attorney general," rather than in pursuit of a private remedy. *See, Environmental Defense Fund, Inc. v. Lamphier,* 714 F.2d 331, 337 (4th Cir.1983); *see also, Fallowfield Dev. Corp. v. Strunk,* 37 ERC 1076 (E.D.Pa.1993); *Commerce Holding Co., Inc. v. Buckstone,* 749 F.Supp. 441 (E.D.N.Y.1990). McGraw–Edison contends that Raytheon's request for injunctive relief under RCRA is really an attempt to "reduce its own potential liability for such cleanup costs[,]" rather than an action on behalf of the public good. The 7th Circuit has already rejected this position in *AM Int'l, Inc. v. Datacard Corp.,* 106 F.3d 1342 (7th Cir.1997). In *Datacard,* AMI argued that Datacard was not a proper party to bring a citizen suit, "contend[ing] that Datacard, a potentially responsible party under CERCLA, was not acting in the public interest...." *Id.* at 1349. The 7th Circuit "[agreed] that the idea behind citizen suit enforcement is to unleash an army of private attorneys general to force cleanups when the government drags its feet." *Id.* However, "the plain language of RCRA and CERCLA does not exclude parties like Datacard from the class of potential citizen suit plaintiffs. Rather, both RCRA and CERCLA allow any person to bring citizen suits." *Id.* Raytheon, like Datacard, qualifies as "any person" within the meaning of the statute and thus may pursue a citizen suit under RCRA irrespective of its motive.

### III

▇ Raytheon brings a CERCLA cost recovery action under 42 U.S.C. § 9607(a)[4] and, in the alternative, a contribution action under 42 U.S.C. § 9613(f)(1)[5]. McGraw–Ed-

ison posits that the United States Supreme Court's decision in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), which clarified the presumption against the retroactive application of federal statutes, establishes that CERCLA applies only prospectively. Therefore, because the disposal activity at issue occurred prior to CERCLA's enactment, McGraw–Edison argues that Raytheon cannot assert a CERCLA claim. *Landgraf* does instruct that absent an express statement, there must be evidence of clear congressional intent favoring retroactive application of a statute. *Id.,* 511 U.S. at 280, 114 S.Ct. at 1505. *See also, Hughes Aircraft Co. v. United States ex rel. Schumer,* —— U.S. ——, ——, 117 S.Ct. 1871, 1875, 138 L.Ed.2d 135 (1997). However, pre-*Landgraf,* CERCLA consistently was found to apply retroactively. *See, e.g., U.S. v. Northeastern Pharm. & Chem. Co.,* 810 F.2d 726 (8th Cir.1986) (recognizing the presumption against retroactive application of statutes and finding that Congress clearly intended for CERCLA to apply retroactively). *Landgraf* has not altered this reading of CERCLA. *See, e.g., State of Nev. ex rel. Dept. Of Transp. v. U.S.,* 925 F.Supp. 691 (D.Nev.1996); *U.S. v. Olin Corp.,* 107 F.3d 1506 (11th Cir.1997); *Continental Title Co. v. Peoples Gas Light and Coke, Co.,* 959 F.Supp. 893 (N.D.Ill.1997); *The Ninth Ave. Remedial Group v. Fiberbond, Corp.,* 946 F.Supp. 651 (N.D.Ind.1996); *Gould Inc. v. A & M Battery & Tire Service,* 933 F.Supp. 431 (M.D.Pa.1996). Only one district court to consider the issue held that *Landgraf* limited CERCLA to prospective application only, and that court's decision was reversed on appeal. *See Olin Corp.,* 107 F.3d 1506, *rev'g* 927 F.Supp. 1502 (S.D.Ala.1996). Even prior

can be reached in this regard. Indeed, Raytheon already disputes the accuracy and/or interpretation of these analyses.

**4.** Section 9607(a) reads as follows: "The owner and operator of a vessel or a facility, [or] any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for ... any other necessary costs of response incurred by any [person other than the United States Government, a State, or an Indian tribe] consistent with the national contingency plan...."

**5.** Section 9613(f)(1) reads as follows: "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.... In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."

to the reversal, other courts declined to follow the lower court's ruling. *See, e.g., Gould Inc.,* 933 F.Supp. at 438 (finding the district court's decision in *Olin* unpersuasive in light of the "myriad of opinions applying CERCLA retroactively"). McGraw–Edison cites no other authority supporting its contrary reading of CERCLA. Therefore, aligning itself with the clear and overwhelming trend of cases on the issue, the Court finds that Congress clearly intended that CERCLA apply retroactively.

 McGraw-Edison also contends that Raytheon, whose ownership of the property qualifies it as a potentially responsible party ("PRP") under CERCLA, is limited to a contribution action under § 113.[6] Potentially responsible parties generally are limited to contribution actions under § 113. *See, Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761 (7th Cir.1994); *see also, Rumpke of Indiana, Inc. v. Cummins Engine Co., Inc.,* 107 F.3d 1235 (7th Cir.1997); *United Technologies Corp. v. Browning–Ferris Industries, Inc.,* 33 F.3d 96 (1st Cir.1994), *cert. den.,* 513 U.S. 1183, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995). However, in the *Akzo* decision, the 7th Circuit noted a possible exception for current landowners forced to clean up hazardous waste disposed on their property through no fault of their own. *Akzo,* 30 F.3d at 764. The 7th Circuit later confirmed this "innocent landowner" exception in the *Datacard* and *Rumpke* decisions. In *Datacard,* the current owner of the property actually paid less for the property precisely because it was contaminated. *Datacard,* 106 F.3d at 1346. On those facts, the 7th Circuit stated:

> While this may have rendered Datacard a little less "innocent" than the landowner described in *Akzo,* Datacard did not take part in the manufacture of Blankrola. Instead, Datacard—like a party forced to clean up contamination on its property due to a third party's spill—faces liability merely due to its status as landowner. As a result, Datacard qualifies under *Akzo's*

exception and can directly pursue its response costs under § 107(a)(4)(B).

*Id.* In *Rumpke,* the landowner knew nothing of the contamination prior to purchase and contributed nothing to the contamination. The 7th Circuit held that the landowner could bring a direct cost recovery action under CERCLA:

> [W]e see nothing in the language of § 107 that would make it unavailable to a party suing to recover for direct injury to its own land, under circumstances where it is not trying to apportion costs.... It is true that liability under § 107(a) is joint and several, and § 113(f) exists for the express purpose of allocating fault among PRPs. Nevertheless, one of two outcomes would follow from a landowner suit under § 107(a): either the facts would establish that the landowner was truly blameless, ... or the facts would show that the landowner was also partially responsible, in which case it would not be entitled to recover under its § 107(a) theory and only the § 113 claim would go forward.... We conclude ... that landowners who allege that they did not pollute the site in any way may sue for their direct response costs under § 107(a).

*Rumpke,* 107 F.3d at 1240–41.

McGraw-Edison does not assert that Raytheon contributed to the presence of hazardous materials on the property. Nor does it argue that Raytheon had any knowledge that such waste was on the property prior to the purchase. At this point, Raytheon's liability stems solely from its ownership of the property. Moreover, Raytheon asserts, and McCraw–Edison does not dispute, that it is not responsible for the presence of hazardous waste on the property.[7] (Am. Compl. at ¶ 16.) As delineated in *Datacard* and *Rumpke,* a party in Raytheon's position may bring

---

**6.** "[T]he owner and operator of a vessel or a facility" is a potentially responsible party under CERCLA. 42 U.S.C. § 9607(a)(1).

**7.** McGraw-Edison points to Raytheon's excavation, storage, and disposal of the contaminated soil to show Raytheon's liability. But Raytheon undertook these actions in an effort to clean up someone else's mess. It would be a curious precedent indeed to hold that such benevolent action prevents Raytheon from seeking direct cost recovery under § 107(a).

a direct cost recovery action under § 9607(a).[8]

Having asserted (unsuccessfully) that Raytheon is limited to a contribution claim, McGraw–Edison further contends that the contribution claim should be dismissed because Raytheon failed to comply with the requirements of the National Contingency Plan ("NCP"). As this Court has stated in the past, failure to comply with the NCP will prevent recovery. *See VME Americas, Inc. v. Hein–Werner Corp.*, 946 F.Supp. 683 (E.D.Wis.1996); *see also, Environmental Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503 (7th Cir.1992); *G.J. Leasing Co., Inc. v. Union Elec. Co.*, 825 F.Supp. 1363 (S.D.Ill. 1993). However, in *VME Americas*, the issue came before the Court on a motion for summary judgment. The Court examined a much more extensive record than is available here. This is a motion to dismiss. Raytheon pleads that it substantially complied with the NCP, (Am. Compl. at ¶¶ 41, 45), and considering the scant record available at this time, it would be premature to reject that assertion. *Accord Commerce Holding Co. v. Buckstone*, 749 F.Supp. 441, 444 (E.D.N.Y. 1990) (declining to dismiss a CERCLA claim for failure to comply with the NCP, stating that "the question of consistency with the NCP cannot be determined on the complaint alone.").

## IV

In addition to its federal claims, Raytheon asserts eleven pendent state law claims: (1) negligence; (2) trespass; (3) nuisance; (4) reckless disregard; (5) abnormally dangerous activity; (6) breach of warranty; (7) negligent misrepresentation; (8) intentional misrepresentation; (9) strict responsibility misrepresentation; (10) contribution/indemnification; and (11) breach of contract.

This Court may exercise supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.[9] The Court may also decline to exercise supplemental jurisdiction over a claim if "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c); *see also, United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Insofar as "pendant jurisdiction is a doctrine of discretion, not of plaintiff's right," *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139, McGraw–Edison urges the Court to decline supplemental jurisdiction. It asserts that Raytheon's state law claims substantially predominate over its federal claims, citing the breadth of evidence needed, the introduction of a jury and possible juror confusion, and the frustration of the expeditious resolution of the federal claims.

Some courts find that such considerations weigh strongly against exercising supplemental jurisdiction, while others find these considerations unpersuasive. *Compare, e.g., Town of Jaffrey v. Town of Fitzwilliam*, 846 F.Supp. 3 (D.N.H.1994) (state claims predominate); *United States v. Colorado & Eastern R.R.*, 832 F.Supp. 304 (D.Colo.1993) (same); *Commerce Holding Co. v. Buckstone*, 749 F.Supp. 441, (E.D.N.Y.1990) (same), *with Arawana Mills Co. v. United Technologies Corp.*, 795 F.Supp. 1238, 1248–49 (D.Conn.1992) (quoting *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032 (2nd Cir. 1985)) ("Our Court of Appeals favors the exercise of pendent jurisdiction ... [and has] explicitly held that 'it is irrelevant that the

---

8. McGraw-Edison further asserts that, since Raytheon is limited to a § 9613(f)(1) contribution claim, it cannot seek declaratory judgment as to McGraw–Edison's liability for future response costs. Declaratory judgment is only available in a direct cost recovery action. 42 U.S.C. § 9613(g)(2); *see also, Reichhold Chem., Inc. v. Textron, Inc.*, 888 F.Supp. 1116, 1124 (N.D.Fla. 1995) ("By its explicit language, [§ 113(g)(2)] applies only to cost recovery actions under § 107."). However, so long as Raytheon's direct

cost recovery action stands, it may seek declaratory judgment under § 113(g)(2).

9. Section 1367 states, in relevant part: "... in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...."

scope of relief under state law differs from that under federal law.' "). This District has noted that the "exercise of pendent jurisdiction in CERCLA claims is favored." *INX Int'l Ink Co. v. Delphi Energy & Engine Management Sys.*, 943 F.Supp. 993 (E.D.Wis.1996) (Warren, J., presiding). In keeping with the latter view, the Court exercises supplemental jurisdiction over Raytheon's state law claims.

## V

■■■ As for the merits of these claims, there is a strong argument for the dismissal of all of the tort claims (specifically, pendent claims I–V and VII–IX) on the basis of the economic loss doctrine. "Like many other states, Wisconsin has adopted the 'economic loss doctrine,' pursuant to which a party bringing a tort claim cannot recover damages that are solely 'economic' in character if its claim arises out of a commercial transaction." *Stoughton Trailers, Inc. v. Henkel Corp.*, 965 F.Supp. 1227, 1230 (W.D.Wis.1997). Raytheon's tort claims seek damages "including, but not limited to, a decline in value of the Property, the loss of its use and enjoyment of the Property, stigma damages, and the incurring of substantial cost for the environmental investigation and subsequent remediation of the Property." (Am. Compl. at ¶¶ 51, 56, 61, 67, 76, 95, 102, 109.) McGraw–Edison argues that the same are claims for economic losses not recoverable in tort. Raytheon counters that this is not the type of act on to which the economic loss rule applies, and even if it was, it seeks damages which are not solely "economic" in nature.

■■■ The economic loss doctrine rests upon the general distinction between contract law and tort law. That is, when contractual expectations are frustrated because of a defect in the subject matter of the contract, a party's remedy lies exclusively in contract. However, when the subject matter of a contract causes physical harm to persons or property other than the subject matter itself, a remedy lies in tort. This basic rule of thumb is echoed throughout many cases dealing with the economic loss doctrine:

> The basic theory of the economic loss doctrine is straightforward. Commercial enti-
> ties are capable of bargaining to allocate the risk of loss inherent in any commercial transaction. Courts should assume that parties factor risk allocation into their agreements and that the absence of comprehension warranties is reflected in the price paid. Permitting parties to sue in tort when the deal goes awry rewrites the agreement by allowing a party to recoup a benefit that was not part of the bargain.

\* \* \* \* \* \*

> The economic loss doctrine does not apply where a product that one party has purchased from another party causes personal injury or property damage to property other than the product itself. In those instances, the traditional concern of tort law prevails: protecting society from an unreasonable risk of danger. Although commercial entities might be able to allocate the risk of personal injury or other property damage through contract, a baseline rule is necessary to protect the average consumer, who is generally not as capable as a commercial entity of protecting himself against the risk of loss occasioned by a physical injury.

*Stoughton Trailers*, 965 F.Supp. at 1230, 1231.

> The basis for prohibiting the recovery of economic loss in cases involving a claim of a defective product is the distinction between a tort claim and a contract claim. The gist of a tort claim is that the plaintiff has suffered personal injury or harm to property other than the product itself as a result of the inferior quality of the product.... Tort law is concerned with safety.

> In contrast, the principle of economic loss is based on contract law.... Recovery for economic loss allows purchasers to seek redress for a product which fails to work for its intended use.... Recovery for economic loss focuses on the agreement between the seller and the purchaser of a product.... Contract law is based on the protection of reasonable expectations. "The insight behind the [economic loss] doctrine is that commercial disputes ought to be resolved according to The principles of commercial law rather than according to

tort principles designed for accidents that cause personal injury or property damage."

*Metal Processing Co., Inc. v. Amoco Oil Co.*, 926 F.Supp. 828, 832 (E.D.Wis.1996) (citations omitted).

The distinction between physical harm (tort actions) and economic loss (contract actions) is based on the traditional distinction between tort law and contract law. Tort law rests on obligations imposed by law; contract law rests on obligations imposed by bargain.

\* \* \* \* \* \*

Thus defects of suitability and quality are redressed through contract actions and safety hazards through tort actions.

*Northridge Co. v. W.R. Grace and Co.,* 162 Wis.2d 918, 933, 934, 471 N.W.2d 179, 185 (1991).

Cases such as this, however, are not easily categorized for purposes of the economic loss doctrine. It is a hybrid of sorts. On the one hand, Raytheon purchased a parcel of land which later proved to have a defect, *i.e.,* it was contaminated. It incurred costs in an effort to repair the defect and obtain the benefit of its bargain. No costs were incurred for injuries or damage to persons or property other than the land itself. In this sense, the case seeks damages for frustrated contractual expectations. On the other hand, the only reason the contamination had to be removed was because the law deems the same a threat to public health and the environment. Absent such a threat, and such laws, Raytheon had no obligation or need to clean up the site. In this sense, the case seeks damages for a safety hazard.

The Wisconsin Supreme Court faced a similar dilemma in *Northridge Co. v. W.R. Grace and Co.,* 162 Wis.2d 918, 471 N.W.2d 179 (1991). In *Northridge,* the plaintiffs filed suit against the seller of an asbestos-based fireproofing material used in the construction of plaintiffs' shopping centers. Plaintiffs asserted both warranty and tort claims, including the torts of negligence and strict products liability. Plaintiffs sought damages for the costs of removing the asbestos and the diminution of the property's value. The trial

court found that such damages "were solely economic losses unrelated to any physical harm to property" and dismissed plaintiffs' tort claims. *Id.,* 162 Wis.2d at 922, 471 N.W.2d at 180. The Wisconsin Supreme Court recognized the difficulty of trying to categorize such a claim for purposes of the economic loss doctrine:

The alleged damages in this case have characteristics associated with both economic loss and physical harm to property. The allegedly hazardous characteristic of the Monokote is its contamination of the buildings with asbestos. In this kind of case, no outwardly visible evidence of physical harm to the property exists. We infer from the complaint that the harm claimed is that the Monokote causes the air to contain particles of asbestos which are injurious to occupants of the buildings but invisible to the naked eye.

In addition, the plaintiffs' claimed damages—expenses incurred to remove or replace the Monokote and the diminished value of their property due to the presence of the Monokote—appear to be the kind of damages typically associated with defects in the product itself and considered economic losses.

*Id.,* 162 Wis.2d at 931, 471 N.W.2d at 184. To resolve the dilemma, the Supreme Court "examine[d] the complaint ... to determine whether the damages the plaintiffs allege are more akin to economic loss or physical harm to property." *Id.,* 162 Wis.2d at 937, 471 N.W.2d at 186. After reviewing the complaint, the Court focused on the fact that plaintiffs alleged damage to their building as a result of the asbestos. The same constituted damage to property other than the asbestos itself, and therefore the Court concluded that plaintiffs' damages were "more akin" to physical harm:

The plaintiffs do not appear to assert in their tort counts in the complaint that the Monokote itself was inferior in quality or did not work for its intended purpose, the essence of a claim for economic loss. The plaintiffs are not dissatisfied with the quality of the Monokote as a fireproofing material. The plaintiffs' loss did not arise from deterioration or insufficient product value.

The plaintiffs are not claiming damages because of injury to the product itself. The essence of the plaintiffs' claim is that Monokote releases toxic substances in the environment thereby causing damage to the building and a health hazard to its occupants. The plaintiffs claim that their property has been physically altered by the defendant's product, whether or not such alteration is outwardly visible.

We conclude that the plaintiffs' allegation that the defendant's asbestos-containing product physically harmed the plaintiffs' building is the type of injury which is actionable under claims for relief in strict products liability and negligence. The principles and policies underlying strict products liability actions, namely, public safety and risk sharing, justify recognizing the tort claims.

*Id.,* 162 Wis.2d at 937–38, 471 N.W.2d at 186.

Cases involving the purchase of contaminated land, however, can be distinguished from asbestos cases like *Northridge,* especially on the facts alleged in this case. First, unlike the buyer of asbestos, the purchaser of contaminated land essentially is asserting that the product itself is defective or "inferior in quality"; defective, because it is contaminated.[10] Second, the damages incurred are "damages because of injury to the product itself". Unlike *Northridge,* there is no allegation in this case that the contamination injured people or damaged other property. Nor are any damages sought for injuries or damage to persons or property other than the land itself. True, there are general allegations that the contamination might cause harm to the public or to neighboring property, but there are no claims of actual injury and no claim for damages related to such injury. While the mere risk of harm to the public or the environment is sufficient for purposes of pleading a RCRA claim, it is not

sufficient to transpose Raytheon's economic losses into tort damages. Judge Gordon of this District, when confronted with a similar issue post-*Northridge,* drew the same conclusion:

> On the other hand the plaintiff argues that the doctrine should not be applied in this case because this case does not involve a defective product; rather, it involves allegedly contaminated property which could pose a safety threat to others. I disagree. I do not believe that this case is distinguishable from other Wisconsin cases applying the economic loss doctrine merely because the "product" in this case is land as opposed to a piece of equipment or a building. The fact that environmental contamination such as that described in the plaintiff's complaint may pose a health threat does not transpose the plaintiff's claims into tort claims absent some allegation that the alleged contamination resulted in personal injury or damage to property other than the property which was sold to the plaintiff.
>
> Environmental contamination is a serious hazard to public health. Congress recognized that fact by enacting CERCLA and thereby creating a means by which parties could be held responsible for the release of hazardous substances into the environment.... However, absent some allegation that Amoco's actions caused personal injury or harm to property other than the property sold by the defendant to Metal Processing, the plaintiff does not have a tort law remedy against Amoco.

*Metal Processing,* 926 F.Supp. at 832–33. Thus, on the particular facts of this case, Raytheon's claimed damages are "more akin" to economic loss than to physical harm. Raytheon's arguments to the contrary are rejected.[11]

10. The language typically used is that the product does not work or is not suitable for its intended purpose. In the context of commercial or industrial real estate, the intended purpose can be described as the development and use of the property for industrial operations. Indeed, Raytheon was in the process of building a new loading dock on the property when the contamination was discovered. In this sense, the proper-

ty was no longer suitable for its intended purpose.

11. There is still the vague question of the "stigma damages" claimed by Raytheon. It is unclear what Raytheon means in this regard, nor does the Court believe such damages fall outside the scope of the economic loss doctrine. First, any "stigma" arising from the contamination at issue runs directly with the land, not Raytheon. Such

This does not end the inquiry, however. Raytheon makes two other important arguments as to why the economic loss rule should not apply. First, Raytheon argues that the economic loss rule does not apply to transactions involving the sale of real estate. It cites Wisconsin cases in which purchasers of real estate were allowed to sue their sellers and their sellers' brokers in tort. However, none of these cases decided the issue of whether the economic loss doctrine applies to real estate transactions. Indeed, in one of those cases, *Ollerman v. O'Rourke Co., Inc.,* discussed *infra,* the Court left open the possibility that public policy might prevent liability on misrepresentation claims seeking only economic loss. *Id.,* 94 Wis.2d 17, 48–52, 288 N.W.2d 95, 110–12 (1980). Thus, while no Wisconsin state court has extended the doctrine to the sale of real estate, no state court has expressly rejected such an extension either. In such situations, the Court must predict how the Wisconsin Supreme Court would rule. *See, Stoughton Trailers,* 965 F.Supp. at 1230. Raytheon offers no explanation as to why the Wisconsin high court would not extend the economic loss doctrine to sales of real estate, so the Court must explore the issue on its own.

The Wisconsin Supreme Court adopted the economic loss doctrine within the context of a sale of goods. *Sunnyslope Grading, Inc. v. Miller, Bradford and Risberg, Inc.,* 148 Wis.2d 910, 437 N.W.2d 213 (1989). In doing so, the Court explained that "[t]he Uniform Commercial Code ... sets forth the rights and remedies which govern a transaction between two commercial parties of relatively equal bargaining power." *Id.,* 148 Wis.2d at 916, 437 N.W.2d at 215. The Court cited 7th Circuit case law to the effect that permitting tort remedies for economic losses arising out of commercial transaction "would thwart the carefully constructed legislative framework governing sales and commercial relations in the Uniform Commercial Code." *Id.,* 148 Wis.2d at 920, 437 N.W.2d at 217. However, despite this focus on the legislative scheme of the UCC, federal courts in Wisconsin interpreting *Sunnyslope* have not limited its application to the sale of goods. In *Stoughton Trailers,* for example, Judge Crabb of the Western District extended the economic loss doctrine to the provision of services. In *Metal Processing,* Judge Gordon of the Eastern District extended the doctrine to the sale of contaminated land. In doing so, each judge focused on different principles underlying the economic loss doctrine. Judge Crabb focused on the doctrine's presumption that parties to a contract may freely allocate the risks associated with that contract, and concluded therefrom that "[s]ophisticated parties are just as capable of allocating the risk of economic loss in a contract for services as in a contract for a product." *Stoughton Trailers,* 965 F.Supp. at 1233. Judge, Gordon focused on the doctrine's reliance upon the distinction between tort law, which is concerned with safety, and contract law, which is concerned with commercial expectations, and concluded that "this case is [not] distinguishable from other Wisconsin cases applying the economic loss doctrine merely because the 'product' in this case is land as opposed to a piece of equipment...." *Metal Processing,* 926 F.Supp. at 832. These cases demonstrate that the legislative scheme embodied in the UCC is only one of several principles underlying the economic loss doctrine, and that nothing in *Sunnyslope* or its progeny necessarily limits its application to disputes arising out of the sale of goods.

---

a stigma may reduce the value of that land, thereby harming Raytheon, but the same is only an economic loss associated with damage to the property itself. It is not a loss associated with damage to other persons or property. Second, the notion that Raytheon's general reputation is harmed because it purchased or owns contaminated property strikes the Court as a thin reed upon which to transpose this contractual dispute into a tort action. The 7th Circuit recently concluded as much in a decision on appeal from this Court:

The fact that [plaintiff] characterizes some of its damages as loss of goodwill and business reputation "does not transform the nature of its injury." When the loss to goodwill results from the failure of a product to perform as expected, and not from injury to another person or other property, those losses are commercial and are not recoverable in tort. Any other holding would swallow the economic loss doctrine;....

*Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co., Inc.,* 123 F.3d 675, 681–82 (7th Cir.1997).

One could argue, however, that the reason why the economic loss doctrine should be limited to UCC cases is because the UCC contains default warranty provisions protecting a buyer against defects in the product. In essence, there is no *caveat emptor* rule in the sale of goods, unless the seller and buyer expressly disclaim all warranties in the contracting process. Thus, because the buyer of commercial goods has warranty remedies available to him (unless he voluntarily waives the same), there is no need to provide the added protection of tort remedies. In the sale of real estate, however, the general rule is still that of *caveat emptor* (with exceptions not applicable here—see discussion, *infra),* and thus one could argue that tort protections are necessary to protect a buyer who does not get what he bargained for. Such an argument might have force in situations involving an unsophisticated buyer of residential property who purchases from a sophisticated commercial developer or sub-divider. Indeed, Wisconsin recognizes an exception to the rule of *caveat emptor* in precisely such a situation, *see, Ollerman v. O'Rourke Co., Inc.,* 94 Wis. 2d 17, 39–42, 288 N.W.2d 95, 106–07 (1980), and such reasoning might also warrant a similar exception to the economic loss doctrine. However, in cases like this, where two sophisticated commercial entities enter into an arms-length transaction for the sale of industrial property, there is equal bargaining strength on both sides of the table and equal opportunity to inspect the property. The parties are free to allocate the risks of loss through the Contracting process and sufficiently knowledgeable concerning what those risks might be. As Judge Crabb stated in *Stoughton Trailers:*

> Where the parties are sophisticated, experienced entities of equal bargaining power, however, courts do not have to guard the door to tort remedies as zealously. They may presume that the parties have a clearer understanding of their full array of rights and responsibilities and that the contract price reflects the parties' allocation of those rights and responsibilities. Here, where the parties are each sophisticated commercial entities who had the opportunity to bargain for the full array of responsibilities that each party would assume with respect to the painting system, it would thwart the purpose of commercial contract law to allow plaintiff to sue on its negligence claims. Although the Wisconsin Supreme Court has not reached that explicit holding in a case to date, I am satisfied that it would reach that result if presented with the question today.

*Stoughton Trailers,* 965 F.Supp. at 1235. Accordingly, on the particular facts of this case, the Court concludes that the Wisconsin Supreme Court would extend the economic loss doctrine to disputes concerning the sale of real estate.

Raytheon's second argument is that the economic loss doctrine does not apply to fraud claims; specifically, claims for negligent misrepresentation, intentional misrepresentation, and strict responsibility misrepresentation. Again, no Wisconsin court has ever addressed this precise issue, and the Court is left to predict how the Wisconsin Supreme Court would rule on the matter. In doing so, the Court has reviewed decisions from other jurisdictions, and that review indicates that a trend may be developing. That trend recognizes a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent of the underlying contract.

The cases establishing the trend come primarily from courts in Michigan and Florida. In Michigan, the landmark case is *Huron Tool and Engineering Co. v. Precision Consulting Services, Inc.,* 209 Mich.App. 365, 532 N.W.2d 541 (Ct.App.1995). In *Huron,* the parties had entered into an agreement for the sale of a computer software system. Subsequent to the sale, the buyer sued for alleged defects in the system, claiming breach of contract and warranty, fraud, and misrepresentation. The Michigan appellate court phrased the issue as "whether the economic loss doctrine bars plaintiff from bringing a fraud claim independent of its contractual claims under the UCC." *Id.,* 209 Mich. App. at 368, 532 N.W.2d at 543. After citing "the emerging trend ... toward creating an exception to the economic loss doctrine for a select group of intentional torts", *Id.,* 209 Mich.App. at 370, 532 N.W.2d at 544, the

court recognized an exception for claims alleging fraud in the inducement of a contract:

> ... we decline to adopt defendants' position that the economic loss doctrine precludes any fraud claim. Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely—which normally would constitute grounds for invoking the economic loss doctrine—but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. *In contrast, where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.*

*Id.,* 209 Mich.App. at 372–73, 532 N.W.2d at 545 (emphasis added). In creating the exception for "fraud in the inducement" claims, the court was careful to delineate the limits of the exception it was creating:

> The distinction between fraud in the inducement and other kinds of fraud is the same as the distinction drawn by a New Jersey federal district court between fraud extraneous to the contract and fraud interwoven with the breach of contract. *Public Service Enterprise Group, Inc. v. Philadelphia Elec. Co.,* 722 F.Supp. 184, 201 (D.N.J., 1989). With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort.

> > Such fraud is not extraneous to the contractual dispute among the parties, but is instead but another thread in the fabric of [the] plaintiffs' contract claim.... [It] is undergirded by factual allegations identical to those supporting their breach of contract counts.... This fraud did not induce the plaintiffs to enter into the original agreement nor did it induce them to enter into additional undertakings. It did not cause harm to the plaintiffs distinct from those caused by the breach of contract....
> > [*Id.*]

*Id.,* 209 Mich.App. at 373, 532 N.W.2d at 545. Having thus set forth the limits of the exception, the Court found the facts of the case before it did not fit within those limits:

> The fraudulent representations alleged by plaintiff concern the quality and characteristics of the software system sold by defendants. These representations are indistinguishable from the terms of the contract and warranty that plaintiff alleges were breached. Plaintiff fails to allege any wrongdoing by defendants independent of defendants' breach of contract and warranty. Because plaintiff's allegations of fraud are not extraneous to the contractual dispute, plaintiff is restricted to its contractual remedies under the UCC.

*Id.,* 209 Mich.App. at 375, 532 N.W.2d at 546. Several decisions from the federal courts in Michigan have followed the holding of *Huron. See e.g., Allmand Associates, Inc. v. Hercules Inc.,* 960 F.Supp. 1216, 1227 (E.D.Mich.1997); *Lake & Piepkow Farms v. Purina Mills, Inc.,* 955 F.Supp. 791, 795 (W.D.Mich.1997); *Martin v. A.O. Smith Corp.,* 931 F.Supp. 543, 547 (W.D.Mich.1996); *Valleyside Dairy Farms, Inc. v. A.O. Smith Corp.,* 944 F.Supp. 612, 616–17 (W.D.Mich. 1995).

In Florida the seminal case is *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d 1238 (Fla.1996). In *HTP* the plaintiff pled fraud in the inducement of a settlement agreement. The defendant argued that such a claim was barred by the economic loss rule. The Florida Supreme Court rejected this position, stating that the economic loss rule does not bar the assertion of a tort claim independent of the underlying contract:

> HTP contends that this sentence should be interpreted to mean that the economic loss rule has obliterated causes of action for independent torts such as fraudulent inducement. We disagree. The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract.... Fraudulent in-

ducement is an independent tort in that it requires proof of facts separate and distinct from the breach of contract.

*Id.*, 685 So.2d at 1239. However, in creating the exception, the Florida high court expressly agreed with the distinction drawn by the Michigan appellate court in *Huron* "between fraud extraneous to the contract and fraud interwoven with the breach of contract. With respect to the latter kind of fraud, the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort." *Id.* at 1239–40, quoting *Huron*, 532 N.W.2d at 545. Subsequent state and federal court decisions in Florida have recognized and followed HTP's adoption of the *Huron* exception:

> Applying common sense to the [HTP] court's analysis, we decline to adopt the defendants' position that one can always avoid operation of the economic loss doctrine by merely pleading fraud in the inducement. A critical distinction must be made where the alleged fraudulent misrepresentations are inseparably embodied in the parties' subsequent agreement. This would seem especially so where the parties have specifically agreed in an integration clause that their written contract "supersedes all prior agreements or understandings."

It makes sense that a truly independent cause of action for fraudulent misrepresentation, where the ability of one party to negotiate fair terms is undermined by the other's fraudulent behavior, is not barred by the economic loss rule. However, where the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of "fraudulent inducement" to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine.

\* \* \* \* \* \*

[A]lmost any contract claim can be framed as a fraud in the inducement Action .... therefore it seems more appropriate, if the economic loss rule has any real substance, to look not at the label placed on the claim by the attorney but rather on the substance of the claim.

Fraud in the inducement is an independent tort but the fraudulent misrepresentation underlying the action may or may not be independent of the contract. If we are to say, as some urge, that because fraud in the inducement is an "independent tort" (as opposed to independent of the contract) it is never barred by the economic loss rule, then the matter is resolved by a "bright line" test. But that ignores the distinction set forth in *Huron* .... Would it not be more in keeping at least with the spirit of the original economic loss cases to consider the relationship between the inducing representation and the essential requirements, expressed or implied, of the contract agreed to by the parties?

*Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So.2d 74, 77, 78 (Fla.Ct.App.1997), quoting *Puff 'N Stuff of Winter Park, Inc. v. Bell*, 683 So.2d 1176, 1179–80 (Fla.Ct.App. 1996) (Harris, J., concurring specially); *see also, Dantzler Lumber & Export Co. v. Bullington Lumber Co., Inc.*, 968 F.Supp. 1543 (M.D.Fla.1997); *ThunderWave, Inc. v. Carnival Corp.*, 954 F.Supp. 1562 (S.D.Fla.1997); *McCutcheon v. Kidder, Peabody & Co., Inc.*, 938 F.Supp. 820 (S.D.Fla.1996).

■ There is good reason to believe that the Wisconsin Supreme Court would adopt the rule of *Huron* and *HTP*, particularly on the facts of this case. First, the 7th Circuit has already predicted such a development. *See, Cooper Power Systems, Inc. v. Union Carbide Chemicals & Plastics Co., Inc.*, 123 F.3d 675, 681–82 (7th Cir.1997), citing *Huron* and *Badger Pharmacal, Inc. v. Colgate–Palmolive Co.*, 1 F.3d 621, 628 (7th Cir.1993). The Court is bound by that prediction. Second, the Wisconsin high court has already held that, when the relationship between two parties is defined by a contract, "there must be a duty existing independently of the performance of the contract for a cause of action in tort to exist." *See, Landwehr v. Citizens Trust Co.*, 110 Wis.2d 716, 723, 329 N.W.2d 411, 414 (1983); *see also, Nelson v. Motor Tech, Inc.*, 158 Wis.2d 647, 653, 462 N.W.2d 903, 906 (Ct.App.1990) ("[I]n order to proceed in a tort act on when the parties' rela-

tionship is defined by a contract, there must be a duty in common law independent from any duty created by the contract."). When Wisconsin courts apply this rule, "the existence of a contract is ignored [for purposes of] determining whether the alleged misconduct is actionable in tort." *Nelson,* 158 Wis.2d at 653, 462 N.W.2d at 906. Here, Raytheon argues that McGraw–Edison had an independent duty to disclose the contamination on the property and that its failure to do so is actionable in tort. However, Wisconsin case law is clear that the seller of real estate has no common law duty to disclose conditions on the property for sale except under two conditions:

(1) When there is an actual misrepresentation concerning the condition at issue; or

(2) in situations involving a sub-divider vendor of a residential lot. *Kanack v. Kremski,* 96 Wis.2d 426, 431–434, 291 N.W.2d 864, 866–67 (1980). McGraw–Edison is clearly not a sub-divider vendor of a residential lot. And the only express representations alleged are the warranties contained in the contract itself; specifically, sections 5.12, 5.3.1, 9.1.1, and 7.1 of the underlying contract. (Am. Compl. at ¶ 91.) The existence of these warranties, and the contract as a whole, must be ignored for purposes of determining whether there is a common law duty independent of the contract. Thus, McGraw–Edison had no duty to disclose independent of the contract, and the alleged misrepresentations forming the basis of Raytheon's fraud claims are inseparably embodied within the terms of the underlying contract. Whether the Court applies the Wisconsin Supreme Court's decision in *Landwehr,* or simply predicts the high court's adoption of the *Huron* exception to the economic loss doctrine, the result is the same: Raytheon cannot pursue its fraud claims.[12]

## VI

 Raytheon brings a contribution/indemnification claim against McGraw–Edison based on their "joint liability under federal and state law." (Am. Comp. at ¶ 114.) The question is, joint liability to whom? Under Wisconsin law, "joint liability to the same third person is an element of a plaintiff's claim for common law contribution.... [A] common liability to the same person is a 'prerequisite to a contribution claim.'" *Foss v. Madison Twentieth Century Theaters, Inc.,* 203 Wis.2d 210, 222, 551 N.W.2d 862, 867 (Ct.App.1996) (citations omitted). Raytheon alleges that it "has borne, and continues to bear, a disproportionate share of the cost incurred to satisfy the parties' common and joint liability under federal and state law." (Am. Comp. at ¶ 114.) The complaint, however, does not state to whom this common liability is owed. Raytheon asserts that by pleading a "common duty ... to neighboring landowners" (Am. Comp. at ¶ 113), it has specified to whom this common liability is owed. Not so. Raytheon's duty to clean up the property arises out of a statutory duty under CERC-LA and/or related state laws. Those statutes may have created this duty for the benefit of people and property adjacent to the contaminated site, but like the statute in *Foss,* the statutes "impose[ ] no liability on anyone to anyone." *Foss,* 203 Wis.2d at 222, 551 N.W.2d at 867. Raytheon, having failed to assert a common liability to a named third person, has no common law clam for contribution.

---

12. The Court notes that its decision in this regard departs from Judge Crabb's decision in *Stoughton Trailers,* which held that the economic loss rule would not apply to claims for intentional misrepresentation. Judge Crabb reasoned that "[a] party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract." *Stoughton Trailers,* 965 F.Supp. at 1236. Even if they could, Judge Crabb felt such a requirement "would not be conducive to amicable commercial relations". *Id.* The Court respectfully disagrees with this aspect of Judge Crabb's decision. On the facts of this case, a simple warranty that McGraw–Edison knew of no hazardous conditions existing on the property at the time of sale would have sufficed. Raytheon certainly could have "rationally calculated" the need for such a warranty, and the Court does not feel such a request would have chilled the atmosphere or otherwise jeopardized the deal. Indeed, as argued in its breach of warranty claim, Raytheon contends that it exacted from McGraw–Edison just this type of warranty and seeks recovery for breach of the same.

 As for indemnification under Wisconsin law, "[a] common law claim for indemnification requires proof that the plaintiff was compelled to pay damages for which the plaintiff had no liability." *Id.*, citing *Brown v. LaChance*, 165 Wis.2d 52, 64, 477 N.W.2d 296, 302 (Ct.App.1991). Raytheon asserts that the WDNR's letters directing Raytheon to "hire a consultant, investigate the contamination, and clean up the Site ... [,] backed by the threat of civil penalties ..., certainly 'compelled [it] to pay damages' in a manner sufficient to allow it to maintain [its] indemnification claim." (Raytheon's Brief in Opposition at 25.) The WDNR letters do not support the assertion that Raytheon was "compelled" to clean up the property. (Rasp.Aff., Ex. 1.) As the current owner, Raytheon had a duty to clean up the property, regardless of whether it contributed to the contamination. In undertaking the clean up, Raytheon simply discharged its duty as owner. As such, it was not "compelled to pay damages for which [it] had no liability." *Id.*, 203 Wis.2d at 223, 551 N.W.2d at 867. Moreover, the Wisconsin Supreme Court has held that PRP letters and comparable notification letters by state agencies do not trigger an insurer's duty to defend. *See, City of Edgerton v. General Casualty Co.*, 184 Wis.2d 750, 517 N.W.2d 463 (1994). Despite the adversarial tone of such letters, they are a call for voluntary action. *Id.*, 184 Wis.2d at 775, 517 N.W.2d at 474. As such, they cannot be said to have "compelled" Raytheon to clean up the property for purposes of asserting a common law indemnification claim.

### VII

Raytheon's breach of warranty and breach of contract claims properly raise its complaint under contract law. At this stage of the litigation, the Court cannot determine the scope of liability the parties contemplated when they entered into the contract. Therefore, dismissal at this time is improper. *See Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) ("[B]efore the district court can determine the scope of an indemnity provision, the litigation must progress beyond the initial pleading"). Thus, McGraw–Edison's motion to dismiss is denied with respect to these claims.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. McGraw-Edison's motion to dismiss is denied as to federal claims I, II, and III and pendent claims VI and XI;

2. Defendant's motion to dismiss is granted as to pendent claims I–V and VII–X.